1          IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
2                FAYETTEVILLE DIVISION

3

4
UNITED STATES OF AMERICA              PLAINTIFF
5
v.                    CASE NO. 5:23-CR-50056
6
JIMMY FANT, JR.                       DEFENDANT
7

8  _____

9

10               SENTENCING HEARING

11        BEFORE THE HONORABLE TIMOTHY L. BROOKS

12                 MAY 13, 2024

13              FAYETTEVILLE, ARKANSAS

14

15  _____

16

17

18

19

20

21

22

23

24

25

1                     A P P E A R A N C E S

2

3     FOR THE PLAINTIFF:

4     KENNETH P. ELSER
      United States Attorney
5     414 Parker Avenue
      Fort Smith, Arkansas 72901
6     (479) 494-4071
      kenny.elser@usdoj.gov
7

8
      FOR THE DEFENDANT:
9
      JOSE MANUEL ALFARO
10    Federal Public Defender
      112 West Center Street, Suite 300
11    Fayetteville, Arkansas 72701
      (479) 442-2306
12    joe_alfaro@fd.org

13

14

15

16

17

18

19

20

21

22

23

24

25

9:36AM  1           THE COURT:  The United States versus Jimmy Donald
      2  Fant is now before the Court for sentencing.  Our case
      3  number is 5:23-CR-50056.
      4           Kenny Elser appears for the United States.  Joe
9:36AM  5  Alfaro is present and representing Mr. Fant.
      6           Good morning, Mr. Fant.
      7           THE DEFENDANT:  Good morning, Your Honor.
      8           THE COURT:  Do you understand that the purpose of
      9  this hearing is to allow the Court to impose its sentence as
9:36AM 10  a result of your conviction?
     11           THE DEFENDANT:  Yes, Your Honor.
     12           THE COURT:  In the last 24 hours or so, have you
     13  consumed any medications or alcohol or any type of drug or
     14  substance that might be interfering with your ability to
9:37AM 15  understand what's going on today?
     16           THE DEFENDANT:  No, Your Honor.
     17           THE COURT:  Do you remain fully satisfied with
     18  Mr. Alfaro's legal services?
     19           THE DEFENDANT:  Yes, I do.
9:37AM 20           THE COURT:  Let's begin our hearing with a brief
     21  review of the procedural history that brings us to this
     22  moment.
     23           You appeared before this Court on September 29th of
     24  last year, and at that time, you waived the formal
9:37AM 25  indictment process and you consented to being charged by

9:37AM  1   information with the separate offenses of wire fraud and

2   money laundering.

3          At the end of that hearing, you elected to plead

4   guilty to both of those counts.  I accepted your guilty

9:38AM  5   pleas, but I deferred a decision about approving your plea

6   agreement with the government that had also been made known

7   during the course of that hearing.

8          Afterwards, we began the phase of these proceedings

9   known as the presentence investigation.  Probation Officer

9:38AM  10  Alma Calderon was assigned to do that.  She's with us in the

11  courtroom today.  She filed her initial presentence report

12  on December 15th.  She provided that report to the attorneys

13  and asked if they had any objections or corrections that

14  they wanted to request.

9:38AM  15         The government indicated that they had no

16  objections.  Mr. Alfaro raised nine objections on your

17  behalf.  Officer Calderon then considered the objections.

18  She was able to resolve a few of them, but certainly not all

19  of them, so she proceeded to finalize the presentence report

9:39AM  20  which she filed of record on January 4th of this year.

21         On that same day, she filed another document that

22  we call the addendum to the presentence report, and this is

23  where Officer Calderon explained why she was able to resolve

24  some objections, but she also gave her reasoning as to why

9:39AM  25  she was not resolving some of your other objections.

9:40AM  1        Now, Mr. Fant, I mention these presentence report
2  documents because your attorney, Mr. Alfaro, had a duty to
3  provide you a copy or to review a copy of these documents
4  with you so that you would understand the contents of these
9:40AM  5  documents and how they would be -- how the information in
6  the documents would be used by the Court.
7        Did Mr. Alfaro do those things with you?
8        THE DEFENDANT:  Yes, Your Honor.
9        THE COURT:  And did Mr. Alfaro answer any and all
9:40AM  10  questions that you may have had about the presentence report
11  documents?
12        THE DEFENDANT:  Yes, Your Honor.
13        THE COURT:  All right.  Very well.
14        In addition to reviewing the presentence report,
9:40AM  15  several other documents have been submitted for the Court's
16  review.  Each of the attorneys have submitted sentencing
17  memorandums and the Court has reviewed those.  The Court has
18  also been provided with a victim impact letter.  It's on
19  White River Hardwoods' letterhead.  The victims here are
9:41AM  20  interrelated and I think that this letter speaks for the
21  impact to all of the interrelated victims.
22        The Court has also received impact statements
23  separately from the Johnson family and Joan Johnson.
24        The Court has also received letters of support
9:42AM  25  written in your behalf today, Mr. Fant, one from your wife

9:42AM 1   and another from your daughter, and they give the Court more
2   context about your background and characteristics and I
3   appreciate learning more about you through their lenses.
4          Beyond that, I'm not aware of any other materials
9:42AM 5   that have been provided for the Court's attention in
6   sentencing today.  Mr. Elser, are you aware of anything?
7          MR. ELSER:  No, Your Honor.
8          THE COURT:  Anything else, Mr. Alfaro?
9          MR. ALFARO:  No, Your Honor.
9:42AM 10         THE COURT:  Let's take up the remaining objections.
11         Mr. Alfaro, my understanding would be that there
12  are two substantive objections, three guideline objections,
13  and then some objections having to do with math.
14         Substantively, you have objected to the application
9:43AM 15  of the sophisticated means enhancement.  You have also
16  objected to the enhancement for the victim having incurred a
17  substantial hardship as a result of the fraudulent activity.
18         The third guideline determinative objection has to
19  do with the fact that Mr. Fant, as I understand it, would
9:43AM 20  otherwise qualify for relief or for an adjustment for being
21  a so-called zero-point offender under the new Amendment 821
22  provisions that came out last year, but the substantial
23  financial harm to a victim makes him disqualifying.  So
24  depending on how the Court rules on the substantial hardship
9:44AM 25  enhancement, that also would impact whether he gets

9:44AM 1  zero-point relief or not.

2         So that's my understanding categorically of where

3  we are.  Do you agree or have I misstated that?

4         MR. ALFARO:  We agree with the Court, Your Honor.

9:44AM 5         THE COURT:  And Mr. Elser, I understand that the

6  government would have the burden here and that it's

7  anticipating an evidentiary hearing, is that right?

8         MR. ELSER:  Yes, Your Honor.  I think we have one

9  witness.

9:45AM 10        THE COURT:  You may call your witness.

11        MR. ELSER:  Call Ben Johnson.

12        THE COURT:  Mr. Johnson, if you would please come

13  forward.  Sir, pause about right there and raise your right

14  hand.

9:45AM 15              (Witness Sworn.)

16        THE COURT:  You can have a seat in our witness box.

17        Mr. Elser, you may inquire.

18        MR. ELSER:  Thank you, Your Honor.

19              JACOB BENJAMIN JOHNSON, having been first duly

9:45AM 20  sworn, testified as follows:

21                    DIRECT EXAMINATION

22  BY MR. ELSER:

23  Q.  Mr. Johnson, would you state your full name, please?

24  A.  Jacob Benjamin Johnson.

9:45AM 25  Q.  And where do you reside, city and state?

9:45AM  1    A.  I live in Rogers, Arkansas.

2    Q.  What is your connection with White River Hardwoods and

3    Woodworks, Inc.?

4    A.  I've worked there for about 30 years.  Currently, I'm

9:45AM  5    the director of sales and one of the owners.

6    Q.  And is that a family business?

7    A.  It is a family business.

8    Q.  What family members are involved in the business?

9    A.  Both my parents, the founders, Joanne and Bruce Johnson,

9:46AM  10    and also my brother, Jesse Johnson.

11    Q.  Just briefly describe what the business does, what that

12    business is.

13    A.  Sure.  We do multiple things.  We manufacture

14    architectural hardwood moldings.  We distribute building

9:46AM  15    products from other vendors in the United States.  We also

16    import products and distribute those products, both

17    nationwide and we also export.  We have websites with

18    shopping carts.  We also sell to brick-and-mortar resellers

19    across the United States.

9:46AM  20    Q.  And who would use your product?  What would be a common

21    use for your product?

22    A.  Common use for our product would be people that are

23    doing remodeling or new construction for residential or

24    commercial.

9:46AM  25    Q.  And who started that business?

9:46AM  1    A.  Bruce and Joan Johnson, my parents.

2    Q.  And how did that come about?

3    A.  As they were moving to Arkansas from Texas in the early

4    70s, they were kind of back-to-landers and carpenters and my

9:47AM  5    dad kind of was working with sawmills and lumber people in

6    the St. Paul, Arkansas area, lot of natural hardwoods.  He

7    started working with some people in the sawmills who were

8    sawing up railroad ties.  He was able to take that lumber

9    and then resell it to cabinet shops and other small

9:47AM  10   woodworkers around Arkansas, Oklahoma and Texas.  Over the

11   course of three to five years, he created customers who

12   needed beautiful hardwoods and kind of created White River

13   Hardwoods from those efforts.

14   Q.  And how long has White River been in business?

9:47AM  15   A.  White River Hardwoods was established around 1977, so

16   we've been around for about 50 years.

17   Q.  Approximately how many employees does White River have

18   currently?

19   A.  We currently have about 30 employees.

9:48AM  20   Q.  And where is the offices of White River?

21   A.  We have one headquarters and it's in 1197 South Happy

22   Hollow Road, Fayetteville, Arkansas.  It's about five

23   minutes south of here.

24   Q.  How would you describe the relationship between your

9:48AM  25   family and Jimmy Fant during the time that he was employed

9:48AM 1    by White River?

2    A.  So I've known Jim most of my career.  I started when I

3    was 16 years old in the mail room.  And my family has always

4    relied on Jim.  Jim has also grown up with White River in

9:48AM 5    his career.  We have had a lot of meetings and trust with

6    Jim over the time.  From 30 years ago to now, Jim was our

7    CPA.  He helped us with 401Ks, helped us with financial

8    planning.  He did personal banking, business banking.  He

9    was a trusted employee.  We asked Jim a lot of questions.

9:49AM 10    Jim gave us a lot of answers.  We trusted Jim.  Jim took

11    advantage of us for years.

12    Q.  So I just wanted to talk about the effect that his

13    criminal conduct has had on your family and the business of

14    White River.  Just go through some examples of that.

9:49AM 15        As a result of Mr. Fant's criminal conduct, did your

16    parents, through Matrix Investment, LLC, have to sell real

17    estate in 2018, 2020, 2021 and 2022 totaling approximately

18    $1.3 million to keep White River business going?

19    A.  Yes, we did.

9:49AM 20    Q.  As a result of his criminal conduct, did your parents

21    have to borrow money from their retirement accounts totaling

22    $92,000 to keep White River going?

23    A.  January 2021, they both withdrew about $46,000 each.

24    Q.  As a result of Mr. Fant's criminal conduct, did White

9:50AM 25    River have to take draws against its line of credit in 2018

9:50AM  1    and 2019 totaling approximately half a million dollars to

2    keep White River business going?

3    A.  Yes, sir.

4    Q.  As a result of Jimmy Fant's criminal conduct, did White

9:50AM  5    River have to cut employee hours basically from a 5-day

6    workweek to a 4-day workweek from April of 2020 to February

7    of 2021?

8    A.  Yes, sir.

9    Q.  And how did that affect the employees?

9:50AM  10   A.  We were trying to navigate COVID and how to keep our

11   doors open and profitability.  And instead of letting people

12   go and cutting salaries, we decided to cut from a five day

13   to a four day and keep all the employees employed, keep

14   insurance.  We tried our best to keep morale and keep our

9:51AM  15   team together.  It was tough.  The Johnsons still worked

16   five days a week, while the employees worked four days a

17   week.  It was a tough time for everybody.

18   Q.  And you believe that was due, in large part due to the

19   theft from the company by Mr. Fant?

9:51AM  20   A.  Correct.  We had no money to make payroll.

21   Q.  As a result of Mr. Fant's criminal conduct, did White

22   River have to terminate sales representatives?

23   A.  During some of these meetings -- we had monthly

24   financials with Jim.  The financials were hard to read

9:51AM  25   sometimes, but Jim always said, hey, why don't we let go of

9:51AM  1   these reps?  They are costing White River money.  We don't

2   need them.  This was Jim trying to make White River look

3   profitable.  Jim always kind of said to me, hey, let's get

4   rid of these reps.  We had independent reps all over the

9:52AM  5   United States for 10-plus years, 10 to 15 plus years, that

6   we cut.  We terminated these reps due to Jim's

7   recommendation.

8   Q.  And those reps would have been being paid, in addition

9   to a salary, a commission for those sales that they had?

9:52AM  10  A.  Those would be commission-based reps.

11  Q.  You know that the theft in this case was based on theft

12  of improperly assessing commissions to Mr. Fant?

13  A.  Correct.

14  Q.  Did Mr. Fant's criminal conduct adversely affect

9:52AM  15  employee salaries and raises?

16  A.  Absolutely.  During those years, we gave limited, very

17  few, raises.  We were able to -- it was hard to hire new

18  people.  Couldn't buy new machinery.  Couldn't launch new

19  products.  We were trying to see how small we could get as a

9:53AM  20  company.  It was just always weird, we couldn't ever figure

21  out where the money was at.  We would have big sales.  We

22  would always ask what was going on.  Jim would always have

23  explanations about things.  It was always very concerning.

24  It was very aloof.

9:53AM  25  Q.  So at one point in time, did White River consider a

9:53AM 1   bankruptcy and was that the result of the criminal conduct,

2   now looking in retrospect?

3   A.  We did.  We were looking at options for our business,

4   the future of our business.  Reorganization.  We found out

9:53AM 5   that we would be in a position to have an asset sale.  And,

6   hey, can we sell more land or borrow more money and put more

7   private investment back into the business, try to keep

8   things going as we had done in the past.

9   Q.  So just before Jimmy Fant left White River in

9:54AM 10   January 2023, had your family engaged a company to determine

11   the value of White River for a possible sale?

12   A.  Yes.  We engaged with Sun Business.

13   Q.  And did the value that was placed on the business change

14   after the discovery of the theft by Mr. Fant?

9:54AM 15        MR. ALFARO:  Your Honor, at this time, I would like

16   to make a brief objection to preserve Mr. Fant's rights.

17        I believe the witness is going to testify, as the

18   question is presented by the government, the witness's

19   knowledge of the change of valuation in the company and then

9:54AM 20   put it onto Mr. Fant's activity.  The reason for the

21   objection would be the following:

22        Defense counsel has not received any paperwork or

23   these reports regarding the valuation, so we have not been

24   able to determine how the valuation was made, what market

9:55AM 25   value was used, what factors were considered, or whether

9:55AM  1    standard practices were used or generally acceptable

2    business methods for valuation.

3              Further, I don't believe that this witness prepared

4    those documents.  My understanding is that another employee,

9:55AM  5    accountant at the company prepared those documents or worked

6    with this business.

7              So for those reasons, Your Honor, I think Mr. Fant

8    has an argument under the rights of due process, as well as

9    the confrontation clause.  That's all I have, Your Honor.

9:55AM  10             THE COURT:  Mr. Elser?

11             MR. ELSER:  Your Honor, let me try to lay a better

12   foundation for this testimony.

13   Q.  So have you reviewed the -- was there a company hired to

14   do an evaluation?

9:56AM  15   A.  Yes.  I was involved during this time period when we

16   hired the company to do the evaluation.

17   Q.  And you mentioned it was, I guess, Sun Business

18   Valuations, is that correct?

19   A.  Correct.

9:56AM  20   Q.  And have you reviewed -- there was some letters issued

21   before and after the discovery of Mr. Fant's criminal

22   conduct, is that correct?

23   A.  Correct.

24   Q.  And have you reviewed the documents and were you

9:56AM  25   involved in that process?

9:56AM 1    A.  I have, and, yes, I was.

2    Q.  And was there a valuation that was given before the

3    criminal conduct was discovered and then was that changed as

4    a result of what was discovered with regard to Mr. Fant's

9:56AM 5    theft?

6    A.  January of 2023 --

7            MR. ALFARO:  Your Honor --

8    Q.  Just answer yes or no to that question.

9            THE COURT:  Whoa, whoa, whoa.  Let him finish this

9:56AM 10   foundation, and then keep standing and you can reassert your

11   objection.

12           MR. ALFARO:  Yes, Your Honor.  Thank you.

13   Q.  So you have personal knowledge that there was an

14   evaluation made.  It was one value?

9:57AM 15   A.  Yes, sir.

16   Q.  And then after the discovery of the theft, the value

17   increased, is that correct?  You have personal knowledge of

18   that?

19   A.  Yes, sir.

9:57AM 20   Q.  And you also understand from your review of the records

21   and your dealings with Sun that the reason the value changed

22   was because of -- resulted from the discovery of the theft

23   by Mr. Fant?

24   A.  Correct.

9:57AM 25           MR. ALFARO:  Judge, I just want to renew my

9:57AM 1    objections.  It appears the witness's personal knowledge

2    comes from reading the documents that he did not prepare.

3    And so if the government's position is that Mr. Fant's

4    activities caused the change in the valuation, he has a

9:57AM 5    right, under the confrontation clause and due process, to

6    evaluate those records to see how that information was

7    obtained and whether it was obtained accurately under

8    standard business practices.

9            THE COURT:  Mr. Elser, was the testimony that the

9:58AM 10    valuation increased after the discovery of the fraud?

11            MR. ELSER:  Yes, Your Honor.

12            THE COURT:  The materials pertaining to the

13    engagement in the Sun Business broker and the two

14    valuations, were those provided to the defense?

9:58AM 15            MR. ELSER:  So, Your Honor, obviously, the

16    valuation of a company is a sensitive matter.  I did not

17    provide them to Mr. Alfaro prior to today.  I offered for

18    him to review them with the accountant before we came in.

19    He said he wouldn't have time to do that.  I have the

9:58AM 20    documents.  I have the documents that reflect the reason for

21    the valuation.

22            So I think the fact -- one, I would argue, Your

23    Honor, that the Rules of Evidence do not apply.  This is

24    certainly trustworthy, the testimony can be credited as

9:59AM 25    to -- based on the testimony of this witness.  But, no, they

9:59AM 1    were not, but I have them here.  And obviously, I wouldn't

2    ask the Court to take a break to review them, but both of

3    the records are here.

4          THE COURT:  Well, the Rules of Evidence do not

9:59AM 5    apply, but that wasn't the only objection that Mr. Alfaro

6    necessarily was making.  He was saying that his lack of

7    opportunity to review the documents is something more of a

8    constitutional dimension.

9          So you're laying a foundation to elicit testimony

10:00AM 10   that the value of the company was X when the nature and

11   extent of the fraud was still unknown, and the value of the

12   business became Y -- a greater amount than X -- after the

13   discovery of the fraud, if I understand the point.

14         What specific issue is that related to?

10:00AM 15         MR. ELSER:  Your Honor, at the time of the first

16   evaluation, the profits looked one way because it didn't

17   account for the fact that there were millions of dollars in

18   false commissions that were paid.  So the profit that the

19   company was making looked like it was at X when it should

10:01AM 20   have looked like it was Y, which increased the value just by

21   the mere fact that the company should have made -- over the

22   course of this period of time and certainly the last two

23   years, the last year prior to that, the profits just on the

24   theft by Mr. Fant from the business, the commissions, would

10:01AM 25   have been an additional approximately million dollars in

10:01AM 1    profits.

2                So the valuation was -- it's my understanding the

3    valuation was based on the profitability of the company and

4    the profitability of the company was not truly known

10:01AM 5    until after.

6                THE COURT:  I get that.  What issue does it go to?

7                MR. ELSER:  Well, I guess the point is, Your Honor,

8    that the company believed -- the owners believed the company

9    was not doing well.  And he's testified to that.  And maybe

10:01AM 10   it's not that big a point, but the fact that they really

11   were misled as to the value of their company, to the

12   profitability of their company, considered the sale of their

13   company --

14               THE COURT:  Well, maybe if the facts were that they

10:02AM 15   sold it based on a misunderstanding of why the business

16   wasn't generating as much net income as it would without the

17   fraud and they actually sold the company, in effect sold the

18   company at a loss, I can see how that would be relevant.

19   But my understanding is that they didn't sell the company.

10:02AM 20   Once Mr. Fant left, they realized after some time what had

21   been going on and of course that explained the mystery of

22   why the company wasn't as profitable as it should be.

23               But what disputed issue or 3553(a) factor does this

24   testimony go to?

10:02AM 25               MR. ALFARO:  Your Honor, I guess the point that I

10:03AM 1    would make apart from this report -- and I'll just withdraw
2    the question regarding the report -- is that part of the
3    hardship that was suffered is people who had thought their
4    business was failing, that were trying every which way to
10:03AM 5    make a business succeed, were left under the impression --
6    because of both his theft and his lying to them about the
7    business -- that they believed their business was not in
8    good shape. And they didn't know until really he left.
9    They knew once he left that the business should have been
10:03AM 10   doing better than they had thought. This would just be a
11   quantitative example of that.
12           So I'll just withdraw the question. That was, I
13   guess, the point I could make. I believe I could make that
14   through other questions that don't really deal with this
10:04AM 15   evaluation.
16           THE COURT: The objection is sustained.
17   Q. How would you say that the -- what affect did Mr. Fant's
18   criminal conduct in this case have on the overall success
19   and the growth of White River and you and your family's
10:04AM 20   understanding of what was going on with the company?
21   A. Through the course of the last three to five years -- of
22   course it was worse, the last three years were the worst,
23   whatever, couple years -- but it limited us in growth. And
24   we were still trying to, like, sell land and take personal
10:04AM 25   loans and do things while we still had this huge line of

10:04AM 1    credit that we are having to pay off, which we can

2    contribute to bad financial management.

3        Since Jim has left, we have been profitable.  We have

4    hired three or four people to work in Fayetteville at our

10:05AM 5    facility.  We bought machinery.  We have opened another

6    website.  We have grown.  We have expanded.  We have got a

7    new catalog being printed.  We're able to grow as a company.

8    We have got -- we're forward-thinkers at heart, and we want

9    to grow and expand our product line, but for the last five

10:05AM 10   years, we couldn't do anything.  We were trying to figure

11   out how to stay alive.  My mom, for years, she would say,

12   how small can we be?  We went from -- in the 2000s to now,

13   we have changed a lot as a company.  But to say what we have

14   and haven't been able to do is, we couldn't grow.  In fact,

10:06AM 15   we were shrinking to the point of looking to see if we were

16   going to sell the company in an asset sale.

17       And so going from that point three to four years ago to

18   now, now we are able to grow and be profitable, hire

19   employees, and be a company in Northwest Arkansas that we

10:06AM 20   are proud to be.

21   Q.  So do you believe that Mr. Fant's criminal conduct, that

22   because of that, your family and White River suffered

23   substantial financial hardship?

24       MR. ALFARO:  I'm going to object, Your Honor.  I

10:06AM 25   believe that's a legal conclusion that the witness is not in

20

10:06AM 1    a position to make.

2              THE COURT:  You can ask him fact questions, but not

3    an opinion as to the literal name of the enhancement.

4              MR. ELSER:  That's all I have, Your Honor.

10:06AM 5         THE COURT:  Thank you.

6              MR. ALFARO:  May I proceed?

7              THE COURT:  You may, Mr. Alfaro.

8                        CROSS EXAMINATION

9    BY MR. ALFARO:

10:07AM 10   Q.  Mr. Johnson -- it's Johnson, is that right, sir?

11   A.  Yes.

12   Q.  White River did not become insolvent, correct?

13   A.  No.

14   Q.  White River did not actually need to file for

10:07AM 15   bankruptcy, is that correct?

16   A.  Not actually, no.

17   Q.  No one at White River had to postpone retirement?

18   A.  No.  Well, I take that back.  There are some things with

19   my father.  He took -- he basically took -- I don't know the

10:07AM 20   exact dates and everything -- but he took a pay cut and quit

21   taking a paycheck because of making salary.

22   Q.  But not retirement, is that correct?

23   A.  He's a founder of our company and he quit taking a

24   paycheck because of salary, because of profitability.  It

10:08AM 25   did affect our business in multiple levels.

10:08AM 1    Q.   So I hear what you're saying.  But he didn't retire, is

2    that correct?  It's a simple yes or no, sir.

3    A.   What's the question?

4    Q.   He didn't have to retire, is that correct?

10:08AM 5    A.   He's 72 years old and he is retired.

6    Q.   So he's retired now, is that right?

7    A.   He chose to retire.

8    Q.   But he didn't retire during Mr. Fant's employment, is

9    that correct?

10:08AM 10   A.   No.  He took a pay cut while he was working as an owner.

11   Q.   No one needed to relocate or downsize their house, is

12   that correct?

13   A.   Not specifically.

14   Q.   Was White River able to obtain credit during Mr. Fant's

10:08AM 15   employment?

16   A.   Yes.

17   Q.   Was White River able to obtain lines of credit after

18   Mr. Fant's fraudulent conduct was discovered?

19   A.   Yes.

10:09AM 20   Q.   Between approximately 2019 to 2022, did White River

21   purchase new ripsaw equipment?

22   A.   Between what dates?

23   Q.   Approximately 2019 to 2022.

24   A.   Potentially.

10:09AM 25   Q.   So that would be direct conflict to your testimony

10:09AM 1    earlier on direct that White River --

2    A.  That was replacing a piece of equipment that went down.

3    It wasn't an upgrade.  It wasn't --

4    Q.  Sir, if I may --

10:09AM 5              MR. ALFARO:  Your Honor --

6              THE COURT:  Whoa, whoa, whoa.  He's objecting to

7    your lack of responsiveness, I think.  Mr. Alfaro?

8              MR. ALFARO:  I would respectfully request that the

9    Court instruct the witness to let me ask my question, and

10:09AM 10   then obviously I will give the witness a chance to

11   elaborate.

12             THE COURT:  Mr. Johnson, this is cross examination,

13   so please listen to his question.  If it fairly calls for a

14   yes or no, then you should answer it yes or no.  And then on

10:10AM 15   redirect, if the government's attorney sees a need to, he

16   can have you expound; okay?

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Mr. Alfaro?

19             MR. ALFARO:  Thank you, Your Honor.

10:10AM 20   Q.  Mr. Johnson, I just want to apologize.  I'm not trying

21   to trap you.  I just want the record to be clear.

22   A.  Okay.  I apologize.

23   Q.  Thank you, sir.  I apologize as well.

24        Is it fair to say that on direct examination, you

10:10AM 25   testified that White River could not purchase new equipment

23

10:10AM  1  during Mr. Fant's employment?

2  A.  Correct.

3  　　　　MR. ELSER:  Your Honor, I object to the question

4  because I don't believe he testified to that.

10:10AM  5  　　　　MR. ALFARO:  Your Honor, I have it in my notes that

6  the witness said that they were not able to purchase any

7  equipment.

8  　　　　THE COURT:  Well, you can ask him follow-up

9  questions and then you can argue to me whether he said that

10:11AM  10  or not and then I can go back and look at the transcript and

11  figure it out.  But proceed with your questions.

12  　　　　MR. ALFARO:  And I'll just move on.

13  Q.  I just wanted to clarify, Mr. Johnson, did you say that

14  it's possible that White River purchased new ripsaw

10:11AM  15  equipment between approximately 2019 and 2022?

16  A.  We purchased used equipment to replace a piece of

17  machinery that went down that was purchased back in the 80s.

18  It was mandatory equipment replacement.

19  Q.  Also during approximately 2019 to 2022, did White River

10:11AM  20  engage in remodeling building number 3?

21  A.  Potentially.

22  Q.  And did that remodel involve phase 3, running electrical

23  through that building?

24  A.  Potentially.

10:11AM  25  Q.  And to the best of your recollection as director of

24

10:12AM 1    sales and owner of the company, did that task cost

2    approximately $200,000?

3    A.   I don't have these records in front of me, but we did do

4    general maintenance as a business to keep our doors open.

10:12AM 5    Q.   You wouldn't consider remodeling a whole building

6    general maintenance, would you?

7    A.   Depends on the nature of the remodel.

8    Q.   In approximately 2021 or 2022, did White River purchase

9    a new CNC machine?

10:12AM 10   A.   We did.

11   Q.   Did that cost approximately $100,000?

12   A.   Approximately.

13   Q.   Did White River also hire an employee to run the new CNC

14   machine?

10:12AM 15   A.   Yes.

16   Q.   In approximately 2021 and 2022, did White River replace

17   a substantial amount of lighting in several buildings, as

18   well as outside lights?

19   A.   Yes, but I believe we had some grant money to do that.

10:13AM 20   Q.   Did that cost White River approximately $30,000 of its

21   own funds?

22   A.   There was a cost to do that.  Also safety issues were

23   involved.

24   Q.   In approximately 2022, did White River get entirely new

10:13AM 25   phone systems?

10:13AM   1    A.  Yes.

2    Q.  Did that cost approximately $15,000?

3    A.  At the very most.

4    Q.  In approximately 2021 or 2022, did White River expend

10:13AM   5    funds to remodel your office?

6    A.  Yes.

7    Q.  Did that cost approximately $20,000?

8    A.  No.

9    Q.  Did it involve somewhere around that?

10:13AM  10    A.  No.

11    Q.  Do you have an amount in mind that you remember from

12    your recollection?

13    A.  Maybe 6,000.  It was painting.

14    Q.  So that didn't involve combining two offices into one?

10:14AM  15    A.  It was removing a 12-foot wall and some painting.  I

16    hired the crews myself.  It was not a difficult job.

17    Q.  Was it your testimony on direct, sir, that from

18    approximately 2014 to 2022, at least some employees did get

19    raises?

10:14AM  20    A.  It was minimal raises, if any.

21    Q.  So there were some raises, is that correct, sir?

22    A.  Minimal.

23    Q.  From 2014 to 2022, did some employees and owners get

24    bonuses?

10:14AM  25    A.  I don't have records of this information.  I don't have

10:14AM  1    it in front of me.

2    Q.  In your years of working at this White River job being

3    the director of sales and being part owner of a company,

4    your family business, you don't remember if anyone in your

10:14AM  5    family got bonuses?

6    A.  We got bonuses sometimes.  We also took pay cuts

7    sometimes.

8    Q.  From 2014 to 2022, were other owners able to travel

9    internationally on trips?

10:15AM  10    A.  Possibly.

11    Q.  The time frame where White River needed to cut hours for

12    employees, that was directly during COVID, is that correct?

13    A.  Correct.

14    Q.  Be fair to say that that was happening to a lot of small

10:15AM  15    businesses, right?

16    A.  Correct.

17         MR. ALFARO:  That's all I have, Your Honor.

18         THE COURT:  Any redirect?

19         MR. ELSER:  No, Your Honor.

10:16AM  20         THE COURT:  Mr. Johnson, did there come a point

21    when your parents and co-owners of White River had to take

22    loans against their retirement accounts?

23         THE WITNESS:  Yes, sir.  Yes, Your Honor.

24         THE COURT:  Can you tell us more about the timing

10:16AM  25    and approximate amounts and why that occurred?

10:16AM 1          THE WITNESS:  Well, I recall there being more than

2    one occasion.  I don't have the dates in front of me for all

3    the occasions, but the one that we had documented was in

4    January of 2021 when each of my parents took $46,000 each

10:16AM 5    out of their retirement.  It was put directly into White

6    River to make payroll.

7          THE COURT:  To make payroll?

8          THE WITNESS:  To make payroll.

9          THE COURT:  Is this something they decided to do on

10:16AM 10   their own or did they seek advice?

11         THE WITNESS:  It was through the advice of Jim

12   Fant.

13         THE COURT:  What did Mr. Fant tell them about that?

14         THE WITNESS:  Jim Fant would often go to Joan

10:17AM 15   Johnson, our mother, who was our acting president at the

16   time and say, hey, Joan, we need money to pay the line of

17   credit or to make payroll or to buy lumber.  There was

18   usually three or four major expenses coming up every month

19   and he would go up to her and say, this is what we need to

10:17AM 20   do to make this happen.

21         Jim and Joanne, they trusted each other.  And Jim

22   opened all of her mail and did her personal and her business

23   banking.  A lot of trust.

24         THE COURT:  Do you know whether a person who

10:17AM 25   borrows from their 401K has to fill out some sort of

10:17AM 1    application or some sort of paperwork and send it to whoever

2    the trustee of the fund is?

3              THE WITNESS:  I'm sure there was documentation

4    filled out and I'm sure Jim probably filled out most of it

10:18AM 5    and Joanne probably signed the bottom, probably signed the

6    bottom part of the form.

7              THE COURT:  Do you have knowledge of whether there

8    were any penalties associated with their withdrawal or were

9    they old enough that there wasn't a penalty?

10:18AM 10             THE WITNESS:  There were no penalties, to my

11   knowledge.

12             THE COURT:  You mentioned monthly financial

13   meetings.

14             THE WITNESS:  Yes, sir.

10:18AM 15             THE COURT:  Tell me what those look like.

16             THE WITNESS:  So for years and years, we have had

17   monthly financials with the Johnsons and Jim Fant.  Jim

18   would prepare --

19             THE COURT:  And when you say the Johnsons, tell me

10:18AM 20   who all is in the room during the monthly meeting.

21             THE WITNESS:  Yes, Your Honor.  Be Bruce Johnson

22   and Joan Johnson, the founders.  Then my brother, Jesse

23   Johnson, who is our operations manager, 32 years.  I've got

24   30 years with the company as director of sales.  Of course,

10:19AM 25   we have grown up with the business.  And then Jim Fant would

be in the meeting as our accountant.  And he would run
reports out of our computer system, which is NetSuite, and
he would then dump it into an Excel program and he would
make these reports.  And for years and years, Jesse and I,
we always kind of asked Jim if we could look at these
reports differently, if we could have new reports, if we
could do something different than how we had been doing it
for years, because we just kind of felt like things were
just kind of -- I don't know, things just didn't read right.
Things were kind of stagnant, numbers didn't jive.  When we
asked Jim a question, he would circle something and get back
to us, but he never did.  There might be a big number off,
he would circle it and get back to us.  But he always ran
our reports out of our computer system and then put them
into an Excel program and he could manipulate things.

THE COURT:  Manipulate how?

THE WITNESS:  Well, numbers.  It was an Excel
program, Hyperion.  You could dump a bunch of reports into
it and start changing your numbers.

THE COURT:  Do you know in retrospect whether
Mr. Fant was taking actual data, running it through various
programmings and then creating a report that had wrong
information on it, or is the problem that the format in
which correct information was being provided, but the format
of it was such that it was disguising what was going on?

THE WITNESS:  I think a little bit of both.  I think it was, one, being disguised because it was sloppy and hard to read.  And, two, there was probably information left out.  And because we had been reviewing it that way for so many years, we were kind of used to it being the way it was.  One thing is, you have to realize that all four Johnsons -- my dad, my brother, and my mom are sitting out there -- we are all -- we are not accountants.  We all work every day in sales or manufacturing, and we rely on our accounting team to do their job.

THE COURT:  But you're business people, right?

THE WITNESS:  We are business people, yeah, sure, absolutely.  But we work every day driving a company forward.  And then we have an expectation of what we should have in our financials.  And Jim had been sick for -- he was getting more sick and more sick and so been missing more time out of the office.  And it was just hard.  It was hard to get good information from Jim, and then he would be sick and then he never circled back around and give you an answer on things, or if he did, it was an answer you could live with.  And I remember for many, many, many, many meetings, I just never understood where the money was at.  I would literally say to my family and to Jim, I would be like, I don't understand where the money is going.  Jim would say, well, your average order break-even, meaning you have to

10:22AM  1    make $30,000 a day in sales to break even.  And I couldn't

2    understand.  You start adding up your bills and your freight

3    and all your stuff.  I just couldn't understand his numbers.

4    But there's only so many hours in a day and I've got other

10:22AM  5    responsibilities too.  It was just always very frustrating.

6              THE COURT:  You're the director of sales?

7              THE WITNESS:  I'm currently the director of sales.

8              THE COURT:  When did you become the director of

9    sales?

10:23AM  10             THE WITNESS:  I've been about the last, probably

11   eight or 10 years.

12             THE COURT:  So the largest -- categorically, the

13   largest area where the fraud occurred was the self-payment

14   of commissions for a position that was salaried and wasn't

10:23AM  15   entitled to a commission, as I understand it, is that

16   correct?

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Were the written reports that were

19   provided in conjunction with these monthly meetings, did

10:23AM  20   they have a line item that said what the last month's

21   commissions were or the year-to-date commissions?

22             THE WITNESS:  The commission report, when I was

23   explaining about -- when Jim gave advice to fire the

24   commissioned sales reps, which are independent reps across

10:24AM  25   the United States that sell multiple lines of products, so

they don't work for us.  They work for us and sell our product and they get paid commission, but not employees. They are contract labor.  Those people would have a commission report, but Jim's name wasn't on there.  Jim shouldn't be getting commission.  The report I saw, his name wasn't on the report.

        THE COURT:  Well, I'm trying to understand whether information about commissions in the monthly report was accurate in the sense that the gross number paid in commissions for a given month was accurate, but it was disguised or somehow not presented such that any attention would be drawn to it, or whether despite the amounts of commissions that he was actually paying himself, those amounts were completely backed out of the monthly report.

        THE WITNESS:  Yeah.  It wasn't listed as commission.  It was disguised and hidden and never reviewed.

        THE COURT:  So can you testify one way or the other, do you have personal knowledge as to whether or not the documents that were presented at these monthly meetings were falsified in the sense that Mr. Fant was paying himself commissions, but that commission information was not in the report?

        THE WITNESS:  I can testify that I never -- it was never brought to my attention and I never could clearly see where it was written in the financials.

10:26AM 1          THE COURT:  Well, you had these outside sales

2      people, I understand that.  How many inside sales people

3      that were getting commissions did you have?

4          THE WITNESS:  No inside sales people.

10:26AM 5          THE COURT:  No inside sales people got a

6      commission?

7          THE WITNESS:  We had quarterly bonuses, but they

8      weren't getting commissions.  We occasionally had some

9      commission -- I'm sorry -- bonus situations, but the only

10:26AM 10     people that got commissions were people who had a number

11     tied to their name, like rep number 33, which would be like

12     Georgetown Marketing up in Michigan, and they would get a

13     commission.  And I would review their commission statements

14     and then a check would be cut.  It would be like $400 or

10:26AM 15     $2,000 a month.  They were small commissions.

16         THE COURT:  Were the sorts of people that you just

17     described, the outside sales reps, were they employees or

18     were they independent contractors?

19         THE WITNESS:  These were all independent

10:27AM 20     contractors, the ones I'm describing now.

21         THE COURT:  And their only form of remuneration was

22     the commission?

23         THE WITNESS:  Correct.

24         THE COURT:  Do you have any recollection on either

10:27AM 25     a monthly or a yearly basis what the outside sales

10:27AM 1   representatives' commissions would be in total?

2       THE WITNESS:  I mean, it was 5 percent on sales

3 based on the sales that they sold, and it might have been

4 less than $75,000 for the year.  It wasn't a huge bunch of

10:27AM 5 money.  Maybe 150,000 at the top if there was some big job

6 that came in or something, but this was for the whole year

7 for the United States.  A lot of these reps would get paid

8 like $500, $2,400.  They were smaller commission checks

9 going out.  And Jim ran the reports, I approved them, and

10:28AM 10 then we had a person in accounting that would write the

11 checks.

12       THE COURT:  Well, over an eight-year period, the

13 commissions that he was paying himself, according to the

14 presentence report, totaled about 3.9 million, but if we

10:29AM 15 look just to 2019 to 2022, I mean, these amounts of

16 commissions were well over a half million dollars a year.

17       And I guess my question is, is that something that

18 had -- if $500,000 was being paid out in commissions and it

19 was accurately reported in your monthly or year-to-date

10:30AM 20 financials, is that something -- is that significant enough

21 money that you would have noticed that?

22       THE WITNESS:  Yes, Your Honor.  Yes, Your Honor.

23       THE COURT:  So do you have an opinion about whether

24 these monies were not captured in the monthly or

10:30AM 25 year-to-date financials?

10:30AM  1          THE WITNESS:  Never saw those figures, Your Honor.

2    Never saw those figures.  It was done through iSolved, the

3    payroll, and Jim isolated himself in his office with his

4    authority and his position and with how he wanted mail to be

10:30AM  5    done and emails and his authority with the accounts, the AR

6    person.  He created barriers, firewalls.  He controlled all

7    this stuff, so we didn't know.

8          THE COURT:  I get that.  In the monthly financials,

9    was there information about commissions and the amounts of

10:31AM  10   commissions paid to the outside sales reps?

11         THE WITNESS:  To the independent sales reps, the

12   contract labor, yes, sir.

13         THE COURT:  And no one inside the company received

14   a commission, if I understand your testimony?

10:31AM  15        THE WITNESS:  Not on a regular basis.  And no one

16   in accounting got commission.

17         THE COURT:  I understand that.  So to the extent

18   that Mr. Fant was labeling these extra payments through

19   iSolved to him as a commission payment, those commission

10:31AM  20   payments were not passed through to the monthly financial

21   statements that you reviewed?

22         THE WITNESS:  Never saw them.

23         THE COURT:  Did the company -- is White River

24   incorporated or is it an LLC?

10:32AM  25        THE WITNESS:  We're incorporated.

10:32AM 1    THE COURT:  Is it a subchapter S company, meaning a

2    pass-through entity or do you file --

3        THE WITNESS:  We are a subchapter S.

4        THE COURT:  So the principals get K-1s?

10:32AM 5    THE WITNESS:  I believe so.

6        THE COURT:  Who did the taxes for White River?

7        THE WITNESS:  Independent tax -- I mean, Jim worked

8    with an independent tax agency and then we had -- I didn't

9    do the taxes.  I don't know the names.  We had an

10:33AM 10   independent group do our taxes, based on information that

11   Jim provided.

12       THE COURT:  Did anyone other than Mr. Fant have

13   interaction with the accountants?

14       THE WITNESS:  No, sir.  From what I understand, Jim

10:33AM 15   gave very limited information.

16       THE COURT:  Who signed the tax returns, if you

17   know?

18       THE WITNESS:  We all signed our individuals', and

19   then I'm sure that Bruce or Joanne signed the company's.

10:33AM 20   THE COURT:  So I'm not a tax person, and I'm

21   thankful that I'm not a tax person, but it occurs to me that

22   somewhere in an income tax form, there is going to be a line

23   item expenditure for salaries and wages and commissions.

24       Did you all ever look at that?

10:33AM 25   THE WITNESS:  I did not ever get a chance to see

10:33AM  1    that.

2    THE COURT:  Did the company ever retain an outside

3    auditor?

4    THE WITNESS:  We did not have an outside audit

10:34AM  5    done.  Sun Business was kind of like an outside audit that

6    we were working with to kind of see the business evaluation.

7    And this is one thing that we think stirred the pot up a

8    little bit.  And financials kind of got screwy.  We were

9    asking for a lot of information from Jim, because Sun was

10:34AM  10    requiring information to do their job.

11    THE COURT:  When was Sun retained?

12    THE WITNESS:  It was probably middle of 2022,

13    somewhere in there.  They probably took about six months to

14    do their job and we were probably very slow to get them

10:35AM  15    information, because the information wasn't clean.  And

16    Jim's illness started getting worse and worse.

17    THE COURT:  You have mentioned illness several

18    times.  What illness was he telling you that he had?

19    THE WITNESS:  Well, I mean, Jim had worked at White

10:35AM  20    River for years with diabetes, which we always worked with

21    Jim's schedule, hospital visits or anything that he needed

22    to do.  But he had been getting more and more sick and he

23    told us that he was dying of cancer.

24    THE COURT:  What kind of cancer?

10:35AM  25    THE WITNESS:  Bone cancer.

10:35AM  1          THE COURT:  When did he first start talking about
2    bone cancer?
3          THE WITNESS:  It was like three or four months
4    prior to him leaving.  He kind of said -- he kind of came to
10:35AM  5    the Johnsons and said, I've been meeting with my doctors,
6    I've been having a lot of tests.  He had been kind of out
7    more and kind of more just kind of out of it.  Things were
8    more sloppy with financials, Jim just kind of not being
9    present with his job.  He said he was being diagnosed with
10:36AM  10   cancer and it was really bad and he was needing to leave the
11   job.  And we had employees that were upset and crying.  We
12   had employees that went to therapy because of all this
13   stuff.  I mean, it was hard.  It was hard because it was sad
14   that he was sick and it was sad that he was leaving.  It was
10:36AM  15   a lot of things.  We loved Jim and we trusted Jim.
16         THE COURT:  Did he say that he was leaving because
17   he had developed bone cancer and only had so much time to
18   live, or did he say, you know, it's time for me to retire,
19   and incidentally I also have --
10:36AM  20         THE WITNESS:  Jim told me and many employees that
21   he was going to take a cruise with his family and that it
22   was very important to him to have his family gathering on a
23   cruise ship.  We gave him some extra money for this event.
24   We had a farewell party for Jim where we got people from the
10:37AM  25   mill.  We shut the office down, the company down, to have a

10:37AM  1    farewell party.  Everybody got to say their goodbyes to Jim.
2    We gave Jim some money.  Jim just disappeared.  Jim told me
3    he was going to go jump off the edge of the boat and die.
4    He said, I don't plan on ever coming back to America.  He
10:37AM  5    didn't want his mother-in-law to get the money or something.
6    He said he was sick.  He didn't want to come back.  This was
7    going to be his big --

8              THE COURT:  Sick with diabetes or sick with cancer?

9              THE WITNESS:  Cancer.  And people asked me for

10:37AM 10    months and months and months, how is Jim, where is Jim, how
11    is Jim, where is Jim.  We didn't know.  People saw stuff on
12    Facebook.  We had to lie about stuff.  We knew what was
13    going on because of this case, but we couldn't tell people,
14    hey, he lied to us all.  Hey, he never went to the cruise
10:38AM 15    ship.  Hey, he just took more money from us.

16              Jim came in to our business to help us train on
17    iSolved and accounting practices because he was leaving us.
18    I think he might have gave us two weeks' notice and he left
19    us in a very bad situation with his passwords and his
10:38AM 20    accounting and we could barely get into iSolved.  We had
21    to -- I mean, the FBI could barely get into iSolved.
22    ISolved had us locked out.  It was very difficult to go in
23    his footsteps to try to get our business running.  And it
24    was just a mess, the whole thing was a mess.  Jesse, my
10:39AM 25    brother, was trying to figure out how to do payroll.  We are

10:39AM 1   trying to understand all these systems.  We hired Ryan to
2   come in as an accountant.  Ryan found out what was going on
3   within three days.  Three or four days, Ryan was like,
4   uh-oh, something is going on here, guys.
10:39AM 5                 THE COURT:  What did Ryan discover first?
6                 THE WITNESS:  In iSolved, he found there was a
7   discrepancy in payroll.  And then him and Jesse went and
8   worked all weekend digging into it, looking at past records
9   and files.
10:39AM 10                THE COURT:  The discrepancy being the commission?
11                THE WITNESS:  The commission.  I think it was
12  commission and it was also 401K and there was several
13  different little things going on.  They called us in for a
14  family meeting on a Sunday and kind of laid it out, here is
10:39AM 15  something that we found.  And then we hired Connor to
16  represent us and kind of started down this rabbit hole.
17                THE COURT:  Were the commission payments, I mean,
18  to the outside reps, those were -- were they 1099s?
19                THE WITNESS:  1099s.
10:40AM 20                THE COURT:  The commissions to Mr. Fant were
21  basically rolled into his salary?
22                THE WITNESS:  They were in his salary, yeah.
23                THE COURT:  So did White River also have to match
24  the unemployment and Medicare and those sorts of employee
10:40AM 25  withholdings?

10:40AM 1          THE WITNESS:  He was -- I don't know the full

2    details, but he was pretty much doing whatever he wanted to

3    do.  He had his personal bank account and our business bank

4    account tied together on his computer screen, and he could

10:41AM 5    move funds around between business and personal, between our

6    business and his personal checking, which I don't understand

7    how the bank let him do that, but somehow he got passwords

8    or permission to do that.  Jim was stealing money to fund

9    his 401K, his salary, and his, yeah, his insurance, dental,

10:41AM 10   vision, health, probably his helicopter rides, ambulance

11   stuff.  I mean, everything.

12          THE COURT:  Did he appear to live beyond the means

13   of someone making 60 or 70,000 a year?

14          THE WITNESS:  No.

10:41AM 15          THE COURT:  The presentence report -- which I am

16   privy to -- talks about that he had a computer that was

17   wiped, or at least partially wiped.  Do you have any

18   personal knowledge about a computer being wiped?

19          THE WITNESS:  What time frame?

10:42AM 20          THE COURT:  During the course of something

21   recovered by the FBI.  That's all I know.  And my question

22   to you is, do you have any knowledge of White River's

23   computers being nonoperative or not -- having data missing?

24          THE WITNESS:  Well, we had GCM come in -- who is

10:42AM 25   our computer hosting company -- come in and do security

10:42AM  1    checkups on all of our devices and computers.  I don't know

2    about a hard wipe.

3         THE COURT:  GCM never told you anything about a

4    wipe?

10:42AM  5         THE WITNESS:  I would have to ask the two guys that

6    worked with GCM on that project.

7         THE COURT:  We talked a lot about White River.

8         What about these other two entities?  Are you

9    knowledgable about Matrix and about the castle?

10:43AM  10        THE WITNESS:  Yeah, they are just LLCs that land

11   and monies went in and out of for different things.  LLC

12   Dromborg, Castle Dromborg, was obviously the name of their

13   house they lived in for years, which they recently sold and

14   they downsized to a smaller house so that's kind of

10:43AM  15   nonexistent anymore.  But Matrix was just another LLC that

16   they put land and money and things into.

17        THE COURT:  And I take it that Mr. Fant had access

18   to those accounts?

19        THE WITNESS:  He did.  Full access.

10:43AM  20        THE COURT:  These monthly financial statements,

21   would data about Matrix and Castle Dromborg be reported on

22   those financial statements?

23        THE WITNESS:  No, because that was Bruce and

24   Joanne's information.  I can tell you that Jim came back to

10:44AM  25   White River to help us with something -- and this may be

10:44AM 1  brought up in a victim impact statement later to some

2  degree -- but he came back to help us with something or

3  maybe he forgot to do something on the computer, but I think

4  he stole the last 11 cents out of one account.

10:44AM 5          THE COURT:  When did he come back?

6          THE WITNESS:  It was around January of -- I think

7  Ryan had just been hired about a year and a half ago, and he

8  was coming back to, like, help us answer a couple of

9  questions.

10:45AM 10         THE COURT:  Earlier, you said that after the

11  retirement party, you never saw him again.  So was this

12  before or after the --

13         THE WITNESS:  This was right in that same time

14  frame, within days of each other.  He had left and he was

10:45AM 15  still, like, hey, can you help us -- do you feel okay, can

16  you come in for a couple of hours?  He would say, yeah, I

17  can come in for a couple of hours.

18         THE COURT:  And this was after the retirement party

19  or the going away party?

10:45AM 20         THE WITNESS:  It could have been within that same,

21  like three or four-day time period, because it happened real

22  quick.  It happened real quick.

23         THE COURT:  Does that prompt any other questions,

24  Mr. Elser?

10:46AM 25         MR. ELSER:  No, Your Honor.

10:46AM 1          THE COURT:  Mr. Alfaro?

2          MR. ALFARO:  Yes, Your Honor, if I may.

3          THE COURT:  You may.

4                    RECROSS EXAMINATION

10:46AM 5  BY MR. ALFARO:

6  Q.  Mr. Johnson, you have no personal knowledge that

7  Mr. Fant created fraudulent reports or numbers, is that

8  correct?

9  A.  Say that question again.

10:46AM 10  Q.  Yes, sir.  You have no personal knowledge that Mr. Fant

11  created false reports or false numbers, correct?

12  A.  I don't agree with that statement.

13  Q.  Would it be safe to say you have a belief, but no actual

14  knowledge that he did false reports or false numbers?

10:47AM 15      Would that be a fair characterization?

16  A.  I believe that what Jim gave us was inaccurate

17  information.

18  Q.  You testified -- if I'm correct -- that during your

19  financial meetings when Mr. Fant provided reports, included

10:47AM 20  in those reports would be payroll information, correct?

21  A.  It was -- it included payroll, yes.

22  Q.  Commission payments that White River may have made, that

23  was included in the payroll information, is that correct?

24  A.  Included particular payroll to independent reps.  Not

10:47AM 25  including any of what Jim was taking.

10:47AM  1    Q.   Maybe I asked a bad question.

2    A.   There were different things going on.

3    Q.   When it says payroll, line item, total payroll for the

4    month, that amount would include commission, correct?

10:48AM  5    A.   The commission that the reps got, it was like page 22.

6    It was not -- it wasn't part of payroll.  We never saw what

7    Jim was doing.  Jim kept it -- I mean, clearly, we never saw

8    what he was doing.

9    Q.   I concede that, Mr. Johnson.  I'm not challenging that.

10:48AM 10    I guess my question, maybe to take a step back.  From 2014

11    or 2019, did White River have at least one inside sales rep

12    paid by commission?

13    A.   Potentially.  There might have been a sales rep that got

14    a little commission, yeah.

10:48AM 15    Q.   So my question is, is it your understanding that the

16    payroll number that you and owners would see every month,

17    that number is assumed to include commission payments, is

18    that correct?

19    A.   Potentially.  If accounting was done clearly and

10:49AM 20    precisely, I could maybe give you better information, but it

21    was difficult to read.

22    Q.   But that was normal business practices, right?  If I'm

23    giving you the payroll for the entire company, that would

24    include commission?

10:49AM 25    A.   One would think.

10:49AM 1    Q.  Did you look at every single one of Mr. Fant's pay

2    stubs?

3    A.  I never looked at any of his pay stubs.

4    Q.  So would you be surprised to know that if you look at

10:49AM 5    every single one of Mr. Jim Fant's pay stubs during the

6    duration of this fraud, it specifically identifies his

7    salary, and then in addition to that, specifically shows how

8    much commission he's paying himself?

9    A.  I've seen stubs since this happened.

10:49AM 10   Q.  And does it show that the way I described it?

11   A.  There's a line item.

12   Q.  For each one?

13   A.  There's a commission item.  In iSolved, you can see it.

14   Q.  In your experience as director of sales working with

10:50AM 15   your parents at White River and how it's tied to this Matrix

16   and Castle Dromborg accounts, have you looked at the bank

17   statements?

18   A.  No.

19   Q.  So it would surprise you, then, if they showed every

10:50AM 20   single transfer from the Matrix or Dromborg account went

21   directly to Mr. Fant's personal account?

22   A.  Would it surprise me?  Yeah, it would surprise me.

23   Q.  You testified that the computer that you saw would have

24   Mr. Fant's personal account and then the investment

10:50AM 25   accounts, is that correct?

10:50AM  1    A.   Correct.

2              MR. ALFARO:  I'll pass the witness, Your Honor.

3              THE COURT:  Anything else, Mr. Elser?

4              MR. ELSER:  No, Your Honor.

10:50AM  5             THE COURT:  Thank you very much for your time, sir.

6    You are free to stand down.

7              THE WITNESS:  Thank you, Your Honor.

8              MR. ELSER:  Your Honor, on the issue that kind of

9    was raised by the Court regarding -- I mean, I can call --

10:51AM 10    the accountant is here and the commission payments were

11    included in payroll, so they were disguised in the payroll

12    in the reports.  That would be my proffer.  He's here to

13    testify to that if that is something that the Court would

14    find important.

10:51AM 15             THE COURT:  Well, what I was trying to tease out is

16    whether the commission payments were just omitted from these

17    monthly reports or whether they were right there in plain

18    view if anyone wanted to look at them, or whether they were

19    presented in such a way that the reports were disguised or

10:51AM 20    misleading?

21             MR. ELSER:  Since that is an issue, Your Honor, it

22    would be one question to the accountant if you could allow

23    us to call the accountant.

24             THE COURT:  That's fine.

10:52AM 25             MR. ELSER:  Ryan Ledbetter.

10:52AM 1        THE COURT:  Sir, if you would pause about right

2    there and raise your right hand.

3             (Witness Sworn.)

4             RYAN LEDBETTER, having been first duly sworn,

10:52AM 5    testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. ELSER:

8    Q.   Mr. Ledbetter, would you state your full name?

9    A.   Ryan Ledbetter.

10:52AM 10   Q.   And where do you live, city and state?

11   A.   I live in Fayetteville, Arkansas.

12   Q.   And how are you employed?

13   A.   I'm currently employed as the accountant for White River

14   Hardwoods.

10:52AM 15   Q.   And is it correct that you took over as the accountant

16   for White River after Mr. Fant left?

17   A.   Yes.

18   Q.   And on the issue about how the reports that he prepared

19   for White River's owners reflected the commission payments

10:52AM 20   that were stolen through the iSolved, how were those

21   displayed, if you know, on the reports; as commission or as

22   part of the payroll?

23   A.   They were recorded as salary and wage expense on the

24   financial statements.

10:53AM 25   Q.   So there would be no way of knowing that he was actually

10:53AM 1    getting commission -- there wouldn't be a line item that

2    said $9 million -- not $9 million -- approximately $900,000

3    in 2022 that would show up on the reports that would be

4    able -- that would alert them that some commission was being

10:53AM 5    paid of that amount?

6    A.  No, sir.  That was included in the salary and wage

7    expense.

8              MR. ELSER:  That's all the questions I have.

9              MR. ALFARO:  May I, Your Honor?

10:53AM 10             THE COURT:  Yes.

11                        CROSS EXAMINATION

12   BY MR. ALFARO:

13   Q.  Sir, so the payroll and wages reports provided by

14   Mr. Fant during these monthly meetings contained the

10:53AM 15   fraudulent commission payments, just under the payroll, is

16   that correct?

17   A.  Yes, sir.

18   Q.  And would you agree that every single one of Mr. Fant's

19   pay stubs had a line item for salary and wages, and then an

10:54AM 20   addition line item for the fraudulent commission payments?

21   A.  Yes.

22             MR. ALFARO:  That's all I have, Your Honor.

23             THE COURT:  So the line item on these monthly

24   reports would just say salary and wage expense and it would

10:54AM 25   have one number?

10:54AM  1                THE WITNESS:  Yes, sir.

2                THE COURT:  There was no breakdown?

3                THE WITNESS:  There was no breakdown.  It had all

4       employees under one salary and wage expense, and it included

10:54AM  5       salaries and the commissions paid to Mr. Fant.

6                THE COURT:  But the one line item had everyone's

7       salaries and wages?

8                THE WITNESS:  Correct.

9                THE COURT:  Was there any other comparative data?

10:54AM 10       I have seen sometimes reports are prepared where they can

11       show you, this time last year, wages and salary was this

12       much, and it gives you some sense of whether you are paying

13       more or less.  Was there any other information presented?

14                THE WITNESS:  There would be a year-to-date

10:55AM 15       comparison from prior years.  And as you have probably seen

16       as far as the information provided, that kind of tiered up

17       from really 2015, 2014, 2015, it progressively tiered up as

18       far as that salary and wage.  You could see that trend as

19       well on the financial statements.

10:55AM 20                THE COURT:  So if we look just at the data that was

21       presented in this form that just had one aggregate amount

22       for salaries and wages, that was the information that was

23       being presented on the monthly form to the owners.  But if

24       you're sitting back in the CFO's office or looking at the

10:56AM 25       data that now you, but then Mr. Fant would have had access

10:56AM 1    to, did the system record information for each individual

2    employee?

3         THE WITNESS:  ISolved, yes, records each individual

4    employee's wage.

10:56AM 5         THE COURT:  So if Mr. Fant had wanted to print out

6    a report that broke the one aggregate number into sublines

7    for each individual employee, that was possible?

8         THE WITNESS:  Yes, that is possible to print out of

9    iSolved.

10:56AM 10        THE COURT:  And if the owners wanted to know, how

11   did it get to be this big number, they could have asked for

12   that same information?

13        THE WITNESS:  Yes, Your Honor.

14        THE COURT:  Do you know whether or not Mr. Fant --

10:57AM 15   I know he has a degree in accounting.  Do you know whether

16   or not he held a CPA license?

17        THE WITNESS:  I have received correspondence from

18   the state licensing board in reference to, yes, he did have

19   a CPA license.

10:57AM 20        THE COURT:  Has that been taken away or is it in

21   good standing?

22        THE WITNESS:  The mail was addressed to Mr. Fant.

23   It was certified from the licensing board.

24        THE COURT:  You don't know what it said?

10:57AM 25        THE WITNESS:  No, sir.

10:57AM 1           THE COURT:  Does that prompt anything else?

2           MR. ELSER:  No, Your Honor.

3           MR. ALFARO:  No, Your Honor.

4           THE COURT:  Thank you, sir.  You can stand down.

10:57AM 5           MR. ELSER:  We have no further witnesses, Your

6    Honor.

7           THE COURT:  Any witnesses, Mr. Alfaro?

8           MR. ALFARO:  No, Your Honor.  Just argument.

9           THE COURT:  It is the government's burden by a

10:58AM 10   preponderance here, but I'm going to allow Mr. Alfaro to go

11   first since it's his objection.

12           MR. ALFARO:  Thank you, Your Honor.  Your Honor, I

13   will try to be brief on both of these outstanding

14   objections.

10:58AM 15           Regarding the sophisticated means, Your Honor, we

16   will primarily rely on our briefing in our memo.  I would

17   just note that the circumstances here don't involve the

18   traditional sophisticated means as referenced in the

19   guidelines; Ponzi payments, not multiple jurisdictions, not

10:58AM 20   hiding assets or transactions.  Everything was in his

21   personal name, his personal bank account.  No corporate

22   shells or offshore accounts.

23           Ultimately here, I think it has to be something

24   more than just repetitive conduct over a long period of

10:58AM 25   time.  Even the case the government cites for that

10:59AM 1    proposition, *Fiorito* -- if I'm pronouncing that right -- it

2    wasn't just the repetitive nature there if we dig in that

3    case.  It specifically went on to hold that the defendant

4    there targeted vulnerable victims, but used complex and

10:59AM 5    sophisticated financial tools to increase the amount of

6    money stolen.  And so I think that the crux of the argument

7    here is more captured aptly in the abuse of trust and

8    Mr. Fant's position as a CFO.

9        Turning to the second argument, Your Honor,

10:59AM 10    substantial financial hardship, I think what makes this case

11    difficult is, there is a large amount of money lost over the

12    course of years.  And so we are not trying to discount the

13    pain that the victims have suffered, financially and

14    personally.  We just have to make a determination, and it's

10:59AM 15    incumbent upon me as the defense attorney to hold the

16    government to its burden and to accurately apply the

17    substantial financial hardship.  And that's the key, I

18    think, in the guideline there, the word "substantial."

19    Hardship was faced, clearly, as testified to today by the

11:00AM 20    family and the victims and the letters of support.  But when

21    we break down here these factors, they kind of have two

22    overarching things.  It's not just the harm suffered by

23    losing money.  It's that, plus hardship that triggers

24    substantial change in life circumstances.  And I think that

11:00AM 25    the reason for the objection is just that the guidelines are

asking the Court to look at specific factors that don't quite rise to that level. By that, I mean there's not insolvency, there's not bankruptcy, there's no loss of retirement. They took a loan out of retirement, which impacts them, but they didn't lose -- there's no testimony that retirement was lost. And it appears it was about $96,000, the two loans. So I would simply say that's obviously a harm, but it's not a substantial harm.

There wasn't a substantial change in employment. What I mean by that is, they didn't have to lay off large numbers of employees. They did reduce their hours, and I submit that that was probably just as relevant to the time of COVID that many businesses were suffering in 2020 and 2021. There is testimony that some employees got raises and bonuses and continued to travel. No substantial changes to living environments or relocating or harm in the ability to obtain credit. They were actually able to obtain credit and hire additional employees to make changes and improvements on the business.

So, Your Honor, I think for the reasons that we have laid out in the guidelines, the testimony today, I think while this is a large amount of money loss, given the circumstances provided, the testimony elicited, applying the factors and the guidelines, we would submit that there is not substantially financial hardship here, Your Honor.

11:02AM 1          THE COURT:  Thank you, Mr. Alfaro.  Mr. Elser?

2          MR. ELSER:  Your Honor, on the sophisticated means,

3     I think, as I stated in the brief, you have got multiple

4     schemes here.  It involves a long period of time.  It

11:02AM 5     involves repetitive conduct.  Each time he put a false

6     commission in there that he sent to iSolved, that involved

7     fraud, just as much as a forged check would involve fraud.

8     That transmission was fraudulent and resulted in him

9     receiving the pay.  And now we have had testimony that the

11:02AM 10    reports were fraudulent in the sense that he concealed from

11    them that, I think I can suggest to the Court from the

12    testimony of Ben Johnson that had he seen $900,000 on a line

13    item as a commission, he would have certainly known that

14    there was something afoul here.  But if you include it all

11:03AM 15    as wages and salaries and you slowly increase it over time

16    so that year to year, it doesn't look -- it looks like

17    you're increasing, but not that substantially.  It's a

18    clever scheme, and I would say it's a sophisticated scheme,

19    particularly by somebody who is an accountant that would

11:03AM 20    know what the reports would look like to somebody like the

21    Johnsons who were receiving them.  That he would steal money

22    progressively so that the reports looked like maybe the

23    salary was just increasing as a result of the business.

24         Now, on the financial -- on the substantial

11:03AM 25    financial hardship, there are factors listed in the

footnote, but it does say these factors are nonexclusive and the District Court may consider factors outside those enumerated in the guidelines.

Now, one of the factors is making substantial changes to his or her employment such as postponing his or her retirement plans. Well, we heard testimony that Mr. Bruce Johnson did not take a salary during a period of this time because of that. I would say that that fits. We also heard that he since retired. The fact that a company is doing in their mind badly certainly would influence somebody's decision -- I think Ben testified he was 72 -- as to whether they could retire or not.

I mean, I think if you look at it from the standpoint of, if they had known what the business was actually doing and how well it was doing, would they be better off? Would they have been able to -- would Bruce have retired earlier than he did? All of those, I think, are reasonable conclusions that we can draw from the fact that the defendant was lying to -- he was not only stealing from them, he was lying to them about the success of their company. And you have a family who built up a company from scratch, whose life was invested in this company, who were for many years made to believe that basically they were not doing well, when the truth was they were doing well and could have done a lot better had Mr. Fant not stolen from

11:05AM 1    them and lied to them about why the business was doing

2    badly.

3           So I think all of that taken together does fit this

4    category of the victims having suffered financial hardship,

11:06AM 5    the company, obviously, having to cut back on employees, cut

6    back on hours.  Yeah, COVID came, but the money that

7    Mr. Fant was taking out during the time of COVID certainly

8    would have been part of the calculus as to whether or not

9    you had to cut your hours back.  COVID didn't affect

11:06AM 10   Mr. Fant because he was stealing from the company.  It

11   affected these people that weren't stealing from the

12   company, all of which I would suggest constitutes

13   substantial financial hardship.

14           THE COURT:  Anything else, Mr. Alfaro?

11:06AM 15          MR. ALFARO:  No, Your Honor.  Thank you.

16           THE COURT:  Let's take up the sophisticated means

17   first.  This enhancement is a two-level enhancement.  It

18   appears at 2B1.1(b)(10)(C) where it provides that this

19   enhancement is to apply where the offense, quote, "Involved

11:07AM 20   sophisticated means and the defendant intentionally engaged

21   in or caused the conduct constituting the sophisticated

22   means."

23           Here, I don't think it's disputed, and if it is,

24   the Court finds that certainly the defendant intentionally

11:07AM 25   engaged in this conduct and caused the conduct at issue.  I

11:07AM 1    think the dispute is whether or not the conduct that he
2    engaged in was sophisticated.  So for that, let's look at
3    application note 9(B).

4            There, it explains that sophisticated means are
11:08AM 5    those that are, quote, "Especially complex or especially
6    intricate offense conduct pertaining to the execution or
7    concealment of an offense."

8            Now let's look at some of the case law.  The Eighth
9    Circuit in *United States v. Laws*, 819 F.3d 388 at page 393
11:08AM 10   said, quote, "The relative sophistication of a scheme of
11   fraudulent conduct is viewed in the light of the fraudulent
12   conduct and differentiated by assessing the intricacy or
13   planning of the conduct from similar offenses conducted by
14   different defendants."

11:09AM 15           Next, in *United States v. Melton*, 870 F.3d 830 at
16   page 843.  This is Eighth Circuit as well.  It says, this
17   enhancement, quote, "Is proper when the offense conduct,
18   viewed as a whole, was notably more intricate than that of
19   the garden variety offense ."

11:09AM 20           And in *United States v. Fiorito,* 640 F.3d 338 at
21   page 351, the Eighth Circuit explained, quote, "Even if any
22   single step is not complicated, repetitive and coordinated
23   conduct can amount to a sophisticated scheme."

24           But as the *Laws* court explained, quote,
11:10AM 25   "Importantly, however, mere repetition is not sufficient to

11:10AM 1  make an offense sophisticated.  Instead, the sophistication
2  of the offense conduct is associated with the means of
3  repetition and the coordination required to carry out the
4  repeated conduct and the number of repetitions or the length
11:10AM 5  of time over which the scheme took place."  That's the *Laws*
6  case that I quoted earlier, this time at page 393.
7  Another case *United States v. Finck*, 407 F.3d 908
8  at page 915.  The Eighth Circuit explained, quote, "The
9  total scheme may be sophisticated where all steps are linked
11:11AM 10  together so that the defendant could perceive and exploit
11  different vulnerabilities in different systems in a
12  coordinated way."
13  Going back to *United States v. Melton*, 870 F.3d
14  830, now we're on page 843.  In this case, the Eighth
11:12AM 15  Circuit held that the District Court did not clearly err by
16  finding the defendant's mail fraud scheme to be
17  sophisticated because the defendant's conduct, which lasted
18  over a period of four years, was repetitive and coordinated.
19  In the *Melton* case, there was a situation where the
11:12AM 20  defendant was the CFO of a company -- like our case here --
21  and it was found that he had quote, "Abused his authority,"
22  close quote, to conceal garnishment payments that he owed
23  for a previous judgment against him.  Rather than deducting
24  the payments from his own paycheck, he classified those
11:12AM 25  payments as a, quote, "Legal expense," close quote, on the

11:13AM 1  books of the company that he was the CFO for and had them

2  paid out of company funds.  The defendant quote, "Recorded

3  the payments in the victim's ledger, yet acknowledged they

4  were comparatively minor and thus likely would go

11:13AM 5  undetected.  The defendant consistently mischaracterized the

6  payments in a way he suspected would remain unnoticed."

7  In addition to the mail fraud, the Eighth Circuit

8  found that the defendant's manner of concealment of the

9  payroll tax liability was sophisticated, not because it was

11:13AM 10  repetitive and coordinated, but because it included a

11  different version of the accounting software, writing a memo

12  falsely stating he was working with the IRS, and presenting

13  a doctored IRS form alleging the taxes were paid.

14  So the guideline says what it says.  The

11:14AM 15  application note helps us out a little bit and I think these

16  cases are informative.  There are lots of Eighth Circuit

17  cases that speak to this particular enhancement.  It is a

18  very fact-intensive inquiry in every case.  And in applying

19  the law to this case, I do think it's a close call.

11:14AM 20  On the one hand, one could argue that Mr. Fant's

21  conduct was not sophisticated because he was stealing this

22  money in broad daylight and that if the owners had bothered

23  to look at their bank statements or tax returns, all the

24  information was there.  And was he stealing from them?  Yes.

11:15AM 25  Was he doing it out in the open?  Arguably, yes.  And so

11:15AM 1    therefore, the sophisticated means enhancement shouldn't
2    apply because this is just garden variety fraud.  So I see
3    how that argument can be made with a straight face, and I
4    agree that this is a closer call than in many cases.  But I
11:15AM 5    disagree with the objection here and I will overrule the
6    objection and I will apply the sophisticated means
7    enhancement for these reasons:

8         If we look at that quote from *Melton*, it basically
9    says that this enhancement should apply when the conduct is
11:16AM 10   something more than the garden variety conduct.  Well, this
11   wasn't garden variety conduct.  Mr. Fant was a long-time CFO
12   who, over the course of eight years or so, year after year,
13   ratcheted up monies that he was stealing from the Johnsons,
14   all the while he knew that he was their trusted CFO and he
11:17AM 15   employed a number of different mechanisms and schemes to
16   both steal the money and also to conceal it.  So this wasn't
17   a garden variety case where a lower level employee is
18   stealing the money.  This is the CFO using all of the
19   levelers that he has more or less exclusive access to.

11:17AM 20        Then if we look at that *Fiorito* case, even if any
21   single step is not complicated, repetitive and coordinated
22   conduct can amount to a sophisticated scheme.  Now, we have
23   to take measure that we're not just looking at the
24   repetitive part of that, because the *Laws* case that we have
11:18AM 25   talked about says that mere repetition is not sufficient to

11:18AM 1  make a fraudulent scheme sophisticated.  The sophistication

2  comes in when you associate the means of repetition with the

3  coordination required to carry out that repeated conduct

4  over a great number of repetitions or over a lengthy period

11:18AM 5  of time.  And this is ultimately why I believe that the

6  enhancement applies.

7           To sum it up, it is the vast number of different

8  schemes that were utilized, combined with the

9  repetitiveness, basically.  There was biweekly payroll, so

11:19AM 10  it's 24 payrolls a year, I guess, times eight plus years.

11  Depending on how you characterize a different scheme to

12  either commit or conceal, we have, number one, the payroll

13  scheme, and that was whereby he was paying himself a

14  commission when he's not just some employee.  He's the CFO

11:20AM 15  of this defendant cooperation.  He's in a position to know

16  that salaried individuals, especially salaried individuals

17  in non-sales positions, are not to receive commissions.  He

18  never asked to receive a commission and he knew he wasn't to

19  receive a commission, but he paid himself a commission in

11:20AM 20  gradually increasing amounts.  In the first few years, a

21  little bit to test the waters.  In 2014, he embezzled only

22  about $3,500.  That didn't get detected.  So the next year,

23  he embezzled approximately $28,000.  Then the next year when

24  that didn't get caught, 122.  Then by 2017, we're up over

11:21AM 25  300,000.  And then by 2018, hey, no one is noticing this,

11:21AM 1    454,000 was the total embezzled amount.  By the time we get

2    to 2019, these amounts go from over 400 to over 500 to over

3    600 to over $800,000.  So they increase year after year, and

4    it demonstrates that he is ramping it up until it gets to

11:22AM 5    the stress point where someone is going to find out.  That's

6    just the payroll scheme.

7         He also had a second scheme that I'll call the 401K

8    payment scheme.  This company did not do any 401K matchings,

9    but it did have a 401K where employees could elect to have

11:22AM 10   an amount withheld out of their own salaries.  Well, the

11   defendant, being apparently an extraordinarily greedy

12   person, on top of the commission scheme, he was also having

13   the company make contributions to his 401K.  And he would be

14   singularly unique among any of the other employees in that

11:23AM 15   regard.  So that's scheme number two.

16        Scheme number three is, A, related, and, B, even

17   more egregious.  I surmise that the purpose of having the

18   company pay the 401K money was at least in part to give him

19   the ability to convert that to cash, because we know that he

11:23AM 20   borrowed from his 401K.  The company -- improperly and

21   illegally on Mr. Fant's part -- paid 69,000 to Mr. Fant's

22   401K, but Mr. Fant at some point borrows or had borrowed

23   money from his 401K.  And depending on one's age, most

24   people suffer a penalty, 10 percent or something like that,

11:24AM 25   for having to withdraw early, and then you have to set up a

11:24AM 1   plan to pay it back.  Well, as we all know, paying back
2   money that you have borrowed is always a little bit painful,
3   but I just find fascinating that on top of all of this money
4   that Mr. Fant is stealing through the commission scheme,
11:24AM 5   after having committed scheme number two and having the
6   company pay money into his 401K, he decides, hey, I'm also
7   going to get the company to pay my loan back that I owe the
8   401K trustee.  Who does that?  I mean, he's always pushing,
9   always testing, but that's a separate -- related, but
11:25AM 10  separate -- scheme and it's coordinated with the other
11  have-the-company-pay-my-401K scheme.
12          The fourth scheme is just an outright stickup
13  without a gun using a pen or computer instead.  He just
14  outright transfers money from the victim's separate account
11:25AM 15  called the Matrix, I think it's Matrix Investments.  That's
16  $813,000.  He just transfers money that doesn't belong to
17  him.  He doesn't work for Matrix, but he's been entrusted
18  with caretaking and with overseeing the management of those
19  funds, and over time he steals $813,000.  So that's
11:26AM 20  number four.
21          The fifth scheme is direct transfers from the
22  Castle Dromborg entity or business.  That was $317,000.  And
23  it's similar, but it's a separate scheme because it involved
24  a separate entity.
11:26AM 25          The sixth scheme -- and I just kind of sort of find

this to be despicable and extraordinarily egregious -- when the company runs into some cash flow problems, one of which we heard testimony about today was, we need money to meet payroll. Jimmy, what do we do? We've got payroll and we can't meet payroll. Jimmy, knowing that he is stealing literally hundreds of thousands of dollars a year, looks these people in the eye and says, well, hmm, you know, you all have 401Ks, you could borrow money from your 401Ks and that would give us enough money to make payroll. So on that advice, that's what the owners do, Bruce and Joan. And then once that money is in the payroll account, he effectively, using his other scheme, proceeds to steal it through scheme number one. He just made his -- the available pool of money to further his scheme was supplemented by having the Johnsons cash in a portion of their 401K. That made the pool of money that he could steal bigger, and of course we know that he was stealing more year over year every year under this payroll scheme.

I view that as a separate scheme. He's advising people to liquidate or to borrow from their 401K when he knows that in the past, he's been stealing from the payroll account and he knows that he's going to continue to steal money. We know from the case law that I read that it's not just the sophistication and the things that you will do in the commission of the offense, but also the things that you

11:29AM 1  will do in coordination with the fraud to keep it concealed.

2  So the embezzler always has to think about how it's

3  going to end, and you always wonder if you walk in to

4  work -- if you're the embezzler -- whether that day is going

11:30AM 5  to be the day that the gig is up, that the scheme is

6  uncovered.  But Jimmy, given his age and his bout with

7  Type 1 diabetes, has stolen more and more money.  The last

8  year, stole almost a million dollars.  He's got to figure

9  out a way to exit, because it's going to be hard to keep

11:30AM 10  stealing at that level, and eventually, this house of cards

11  is going to fall.  So what does he do?

12  He tells these people, this family that he has

13  worked for since 1999 and who trust him, not that his

14  diabetes is getting worse and that he just can't work

11:31AM 15  anymore, but he tells them that he has bone cancer.  I'm

16  sorry, I've just been diagnosed with bone cancer, here's my

17  two-weeks' notice, and you know what, I'm going to take my

18  family on a cruise and I may never come back.

19  Planning his exit strategy is a concealment scheme.

11:31AM 20  Not a scheme, but a type of concealment is, he is using some

21  of these criminally derived proceeds and converting it into

22  cashier's checks for large sums of money.  One that's I

23  guess the basis of Count Two is a $25,000 cashier's check.

24  The presentence report also indicates that he made deposits

11:32AM 25  in large sums in cash over at a bank in Oklahoma.  Cash

11:32AM 1    money is found at the bank and a safety deposit box has

2    jewels.  So he's using steps to launder money, to convert

3    these proceeds to cash, to convert them to jewels.  And

4    after stealing over five-point something million dollars,

11:32AM 5    5.4 million, he's lived modestly.  And you look at his

6    current balance sheet, reported balance sheet as contained

7    in the presentence report, and I'm not seeing $5 million

8    that can be accounted for on his balance sheet.  And so his

9    use and where those proceeds, what they have been used for

11:33AM 10   evaporated somehow.  We know that he had a tendency to

11   purchase cashier's checks.  We know that he converted things

12   to cash.  We know that he bought jewels.  Where all those

13   things are, don't know.  But he definitely planned and

14   coordinated over a very long period of time through many

11:33AM 15   transactions, many repetitive types of conduct, many

16   schemes, many years, coordinating all of this, both to

17   commit the offense and to conceal.

18           I see both sides of the argument, but I find

19   through the undisputed facts in the offense conduct section

11:34AM 20   and the testimony today that the government has sustained

21   its burden by a preponderance of the evidence that the

22   sophisticated means enhancement should apply.

23           With regard to the substantial hardship

24   enhancement, pursuant to 2B1.1(b)(2)(A)(iii), a two-level

11:35AM 25   enhancement is applied with the offense, quote, "Resulted in

11:35AM  1    substantial financial hardship to one or more victims."
2    Application note 4(F) is helpful.  It lists six different
3    factors to look to and to consider whether they apply.
4           One is whether the hardship was something that
11:35AM  5    resulted in a victim becoming insolvent; involved a victim
6    filing for bankruptcy; involved suffering substantial loss
7    of a retirement fund; making substantial changes to his or
8    her employment such as postponing retirement plans; making
9    substantial changes to his or her living arrangements, such
11:36AM 10    as relocating to a less expensive home; and suffering
11    substantial harm to his or her ability to obtain credit.
12           I think that this is an extremely close call as
13    well.  I'm not going to drill down on all of the cases that
14    I think are informative, but I've considered *United States*
11:36AM 15    *v. Brandriet,* B-R-A-N-D-R-I-E-T; *United States v. Poulson*,
16    P-O-U-L-S-O-N; *United States v. Castaneda-Pozo*,
17    C-A-S-T-A-N-E-D-A-P-O-Z-O; *United States v. Piper*; and
18    *United States v. Solomon*.  And I've messed up here, because
19    the *Brandriet* case is an Eighth Circuit, but frankly there
11:37AM 20    isn't a whole lot of law on this enhancement, so the *Poulson*
21    case is out of the Third circuit, the *Castaneda-Pozo* case is
22    out of the Eleventh Circuit.  The *Piper* case is out of the
23    Sixth Circuit.  The *Solomon* case is out of the Eleventh
24    Circuit.  There is also *United States v. Reed*.  It's out of
11:38AM 25    the Third Circuit, 2018.

11:38AM    1          Basically, on cross examination, Mr. Alfaro took

2    Mr. Johnson through the examples suggested by the

3    application note and established that the company wasn't

4    ever insolvent.  None of the victims had to file for

11:38AM    5    bankruptcy.  They considered it, but there was no bankruptcy

6    filing.  And they established that they never had a problem

7    getting a loan or obtaining credit.  The rest of the stuff

8    is arguable or a mixed bag; suffering a substantial loss of

9    a retirement account.  Well, the Johnsons did have to borrow

11:39AM   10    from their 401K and the defendant misled them about the need

11    to do that.  But for his theft, they certainly wouldn't have

12    needed to do that.  But the Court doesn't have any

13    information to quantify whether the amounts that they

14    borrowed from the 401K is substantial in relation to the

11:39AM   15    size of their retirement account or not.

16          As to substantial changes in the employment of a

17    victim, such as postponing, we heard some testimony today

18    that suggested that there was.  Bruce Johnson was working.

19    He's a founder of the company.  He's basically working for

11:39AM   20    free.  And we have heard a little bit of testimony about how

21    they downsized their living arrangements.

22          I think it's a close call, but I think on balance

23    and based on my review of the cases that I rattled off, it

24    just doesn't quite seem to chin the bar.  And, again, a

11:40AM   25    major point has to be that we are not talking about whether

11:40AM 1   the amount was a substantial amount.  It was.  We're not

2   talking about whether it had an impact on the operations of

3   the business.  It did.  This particular enhancement is where

4   there is a vulnerable victim that has been preyed upon and

11:41AM 5   it caused, in the circumstances of that particular victim, a

6   substantial financial hardship.  Certainly, there was a

7   financial hardship.  Whether it chins the bar through these

8   illustrative factors as being a substantial financial

9   hardship is the question.  It's a close call.  I find that

11:41AM 10  the government has not met its burden.  At best, it's even,

11  but the government has to chin the bar a little bit more to

12  meet its preponderance burden.

13       Since the substantial financial hardship

14  enhancement doesn't apply, then my understanding would be

11:41AM 15  that Mr. Fant otherwise qualifies for the zero-point

16  offender reduction, so that objection, when we calculate the

17  guideline range, will have to be resolved favorably to

18  Mr. Fant as well.

19       The remainder of the objections basically are

11:42AM 20  mathematical computations that will resolve themselves when

21  the Court take these rulings on these two substantive

22  objections and the math will work itself out.

23       Mr. Alfaro, any other objections that I have not

24  ruled on that I need to?

11:42AM 25       MR. ALFARO:  No, Your Honor.

THE COURT:  The Court will require that a further revised presentence report be prepared to capture the Court's substantive rulings and the effect that that has on the zero-point offender adjustment.  Otherwise, the final presentence report is approved without change or revision.

Now that the Court has benefited from the presentence report, Mr. Fant, I will approve your plea agreement.  I do so based on a finding that your counts of conviction here adequately capture your underlying criminal conduct and behavior.  This means that whatever sentence is ultimately imposed at the end of this hearing, it will be consistent with the terms of your plea agreement.

We're going to need to take a break given how long we have been going, so let me just preview what's next, Mr. Fant, and then we're going to take a recess and we'll come back and finish this up in a moment.

Next, I will be walking you through the various factors that the Court has considered and applied to the facts and circumstances in your case.  And then I'm going to ask for some additional input.  I'm going to ask the attorneys for their views and recommendations as to what an appropriate sentence should be.  And then, sir, I will allow you to make a statement to the Court.  You're not required to make a statement, but I want you to know that I'm happy to hear from you and I'm happy to listen to anything that

11:45AM  1    you might want to say today.

2         So we'll do that when we come back.  We're going to

3    take a 15-minute recess.  We'll go back on the record at

4    noon.

11:45AM  5         (Recess taken from 11:45 a.m. to 12:07 p.m.)

6         THE COURT:  Mr. Fant, I would now like to explain

7    to you the sentencing framework and factors that I have

8    considered in your case as I have deliberated upon what an

9    appropriate sentence should look like for you in this case.

12:07PM  10        The sentencing framework has two steps.  In step

11   one, I'm required to both calculate and consider what we

12   call the guideline range of punishment.  The guideline range

13   was set out in the presentence report and I know that you

14   have reviewed that with Mr. Alfaro, but some changes have

12:07PM  15   been made or need to be made based on some of the Court's

16   rulings today, so let's walk through that now and I'll

17   summarize the calculation for you.

18        To make the calculation, I first need to determine

19   two entry points onto what we call the sentencing grid.  The

12:08PM  20   first entry point is known as the offense level, and the

21   second entry point is known as the criminal history

22   category.

23        In a fraud case such as this, we use guideline

24   2B1.1.  And in your case, that starts with a base offense

12:08PM  25   level of seven.  And then this guideline has several

12:08PM 1    different specific offense characteristics that if they are

2    present, or to the extent that they are present, enhancement

3    levels apply and are added to the base offense level.

4         So we begin with a seven.  And then there is a

12:09PM 5    specific offense characteristic for the amount of the loss.

6    And here, the amount that you're being held accountable for,

7    for your fraud, is $5,267,292.38, and that correlates to an

8    18-level enhancement.

9         I'm going to make a finding that the substantial

12:09PM 10   financial hardship enhancement does not apply, so Officer

11   Calderon, at paragraph 51, I'd ask that you delete the

12   contents there and replace it with the words, "The Court

13   sustained the defendant's objection, therefore, the content

14   of this paragraph is deleted."

12:10PM 15        The next specific offense characteristic that

16   applies, Mr. Fant, is that you committed another offense --

17   money laundering -- and when that is true, there is a

18   one-level enhancement, so that's been applied.

19        For the reasons that the Court explained earlier,

12:11PM 20   you're also receiving a so-called sophisticated means

21   enhancement.  That's a two-level enhancement.

22        You are also being assessed another two-level

23   enhancement for committing this offense conduct in a manner

24   such that it constitutes the abuse of a public or private

12:11PM 25   trust.  You were the CFO of this company.  You're an

74

12:11PM 1    accountant.  These people trusted you and you abused that

2    trust, so that's a two-level enhancement.

3            Doing the math, that gets our adjusted offense

4    level on line 57, a subtotal, if you will, Mr. Fant, is now

12:12PM 5    30.  And we look to Chapter 4 of the guidelines and we need

6    to, Officer Calderon, revise line 58 of the presentence

7    report to state that the zero-point offender adjustment at

8    4C1.1 applies and show a two-level downward adjustment.

9            And then Mr. Fant, you did waive the indictment

12:12PM 10   process.  You came in early and pled guilty.  So the

11   probation officer is recommending that you receive some

12   credit for that in the form of downward adjustments to the

13   offense level for your acceptance of responsibility.

14           The probation officer is recommending the maximum,

12:12PM 15   which is three levels.  I think that's appropriate here.  I

16   do need a motion from the government on the third level.

17           MR. ELSER:  Yes, Your Honor.  We would make that

18   motion.

19           THE COURT:  That motion is granted.  So consistent

12:13PM 20   with your plea agreement, Mr. Fant, you will receive the

21   full three levels of reduction for acceptance of

22   responsibility, and that means that at line 61, the total

23   offense level should be 25.

24           So you will recall that the other input that I

12:13PM 25   needed to calculate was your criminal history category.

There aren't very many moving pieces on this entry point. You have no prior criminal history.  You score zero criminal history points, so you are placed in the lowest criminal history category, which is a category I.

So now that I know that you have a total offense level of 25 and that you're a criminal history category I, I can now make the guideline calculation as follows:

The guidelines would recommend that you be sentenced to a period of incarceration of between 57 and 71 months in the Bureau of Prisons, and for that to be followed by a period of one to three years of supervised release.  The guidelines would further recommend that a fine be imposed and the applicable range is somewhere between 20,000 and $200,000.  The guidelines also recommend any restitution to victims as may be determined by the Court.

For the reasons explained in the presentence report and to the identified and consolidated victim here, the Court finds that you should have imposed a judgment of restitution in the sum of $5,267,292.38.  It is also recommended and in fact required that the Court impose special assessments of $100 per count, for a total of $200 of special assessments.

So that's the guideline range, Mr. Fant, and that's the first factor that the Court must consider.  That said, the guideline range itself is not binding on this Court.

12:15PM  1    It's viewed as a starting place, and although the Court
       2    frequently does sentence within the guideline range, it
       3    doesn't have to sentence there.  Sometimes there are cases
       4    where other factors and circumstances suggest that the
12:16PM  5    guideline range is too harsh.  And when that is the Court's
       6    judgment, then the Court can vary downward and impose a
       7    sentence that is less severe than the guideline range.
       8         However, sometimes there are cases where the
       9    guideline range, in the Court's judgment, is too low.  And
12:16PM 10    where justified by the Court's consideration of other
      11    appropriate factors, the Court does have the ability to
      12    impose a sentence that is more severe than the guideline
      13    range, up to the combined statutory maximums.
      14         So now we go to the second step in the Court's
12:17PM 15    sentencing framework.  Here, we find a whole host of factors
      16    that the Court must consider and apply to the facts and
      17    circumstances in your case.  And this is the mechanism,
      18    these factors are the mechanisms by which the Court can test
      19    the guideline range to see if it's appropriate in your case
12:17PM 20    or not.
      21         For example, the Court must look to the totality of
      22    the facts and circumstances in your case and the relevant
      23    offense conduct.  The Court must also take into account your
      24    personal history and your background and your
12:17PM 25    characteristics.  The Court is also required, when

12:17PM  1  sentencing you, to do so with some context about the

2  sentences that other defendants before you have received who

3  are similar to you with regard to criminal history, or lack

4  thereof, and with regard to the offense of conviction.  The

12:18PM  5  idea here, Mr. Fant, is that the Court must avoid

6  unwarranted differences when it comes to sentencing

7  defendants who are similar in those respects.

8      Mr. Fant, there is another factor that the Court

9  must consider and this is really -- it's really a sentencing

12:18PM  10  principle that sits on top of all of these other factors.

11  And this sentencing principle says that, at the end of the

12  day, the Court's sentence should be one that is sufficient,

13  but not greater than necessary, to achieve the goals and

14  purposes of sentencing.  So what are those?

12:19PM  15      Well, Congress instructs the District Courts that

16  its sentence should be a reflection of the relative

17  seriousness of the offense, while at the same time promoting

18  respect for the law.  A Court's sentence should be one that

19  is just.  A Court's sentence should be one that will deter;

12:19PM  20  one that will deter Jim Fant specifically from committing

21  crime in the future, but also a sentence that will serve to

22  put the public on notice of the punishments that are handed

23  down for this type of criminal activity and thereby serve as

24  a deterrent to the community and to the public more broadly.

12:20PM  25  A Court's sentence should also serve to protect the public

12:20PM 1  from you, to the extent that the Court may have reason to

2  believe that you will reoffend in the future in a way that

3  would put public safety in jeopardy.

4       Along the way, the Court must take into account all

12:20PM 5  of the sentencing options that are available for a given

6  defendant.  The Court must also consider and attempt to

7  effectuate, in the most effective means possible, any

8  adjunct correctional needs that a defendant may have.  For

9  example -- and one that kind of comes to the forefront

12:21PM 10  here -- are medical needs.  But sometimes it's drug

11  rehabilitation.  Sometimes it's educational programming or

12  vocational programming.  Those types of adjunct correctional

13  needs the Court should consider as well.

14       So, Mr. Fant, that's the sentencing framework.

12:21PM 15  Those are the factors that hang on it.  And in a moment,

16  I'll be called upon to answer the question, the ultimate

17  question, which is, does the guideline range in your case

18  get it right, and if so, exactly where within that range.

19  And if the guideline range isn't appropriate, should the

12:21PM 20  Court vary downward or upward, and if so, by how much?

21       Before we get there, we are going to hear from some

22  additional people.  I explained earlier that we will be

23  hearing from the attorneys, but before we hear from the

24  attorneys, my understanding, Mr. Elser, is that there are

12:22PM 25  some victim impact statements that the government would like

12:22PM  1    to --

2              MR. ELSER:  Yes, Your Honor.  And Bruce and Jesse

3    Johnson would be the two witnesses, and they will be brief.

4              Bruce, do you want to come up?

12:22PM  5         MR. BRUCE JOHNSON:  Hello, Your Honor.

6              The actions of Mr. Fant greatly affected the lives

7    of many people, both financially and emotionally.  The

8    schemes that he created caused a financial hardship on White

9    River Hardwoods.  Because of these hardships, the company

12:23PM 10   was unable to grow and stalled the advancement of 20-plus

11   employees financially.  He also created the impression in

12   the office that the company was struggling to pay their

13   bills and make payroll.  Mr. Fant left the company stating

14   that he had terminal cancer and only had a few months to

12:23PM 15   live.  This affected numerous coworkers that he had

16   developed relationships with over the 24 years of

17   employment.

18             He cut off all contact with everyone the day he

19   left leaving people that loved him concerned about his

12:23PM 20   health or if he was still alive.  Those coworkers were

21   devastated when they found out that he had lied about his

22   cancer and that he had stolen from the company that had

23   trusted and loved on him and his family for so long.

24             I know several employees have required professional

12:24PM 25   counseling.  Mr. Fant not only stole from White River, but

12:24PM 1    also directly from the Johnson family.  Because of his

2    greed, the Johnson family contemplated selling the business

3    that they created from nothing and had built into a highly

4    respected company.  A few examples of how he stole directly

12:24PM 5    from the Johnson family are:

6         He had Joan and William Johnson take out loans

7    against their 401K retirement funds.  He used those funds to

8    fund his own payroll scheme.  He recommended the Johnsons

9    sell land that was part of their children's and their

12:25PM 10   grandchildren's legacy, to which he immediately transferred

11   into his own personal account.  Over the last six months of

12   2022, we had little to no visibility to the financial

13   statements of the company's, and an illness was usually the

14   excuse.  Prior to that, anytime there was a question about

12:25PM 15   the financial statements, his response was, he would have to

16   look into that and get back to you, only he would never get

17   those answers.

18        We contracted Sun Business Valuations in mid-2022

19   to do a business evaluation in order to possibly sell White

12:26PM 20   River.  The valuation came back with unfavorable results.

21   After we discovered that Fant stole from the company, we

22   provided Sun with the overstated payroll numbers, and the

23   valuation of White River doubled.  We believe that this

24   evaluation sped up Fant's exit from White River.  That is

12:26PM 25   why he increased the amounts he was taking from the company.

| | |
|---|---|
| 12:26PM | 1 |

He was so greedy that he came back to the office the day
after his retirement party to completely empty the Matrix
and Dromborg accounts.  Over a two-year period, he stole
$1,131,162 from these accounts.  That is on top of the over
4 million he overpaid himself through the payroll system.

        The emotional and financial impact will be felt for
years, but White River Hardwoods and the Johnson family will
persevere because of our hard work and determination.

        I'd like to add, Jim Fant was a friend of the
Johnson family.  And the fact of his betrayal is something
that is hard to live with.  It makes me kind of distrust
people in general.  And the hard work that my family has put
in over the years to grow White River.  That's all.

        Thank you, Judge.

        THE COURT:  Thank you very much, Mr. Johnson.

        MR. ELSER:  Your Honor, Jesse Johnson would also
like to address the Court.

        THE COURT:  All right.  Mr. Johnson?

        MR. JESSE JOHNSON:  Hello, Your Honor.  My name is
Jesse Johnson.  I'm part owner of the business that my
parents started and the plant operations manager.

        Jim Fant was a trusted coworker and friend during
his employment with White River until the very end.  His
story about his terminal cancer came as a shock and a
surprise to me and all his coworkers.  I was personally at a

12:29PM 1    loss of words to express my sorrow for Jim's diagnosis of
2    cancer.  You just don't know how to have that conversation
3    with somebody.  What do you say?  In the end, it was a lie
4    and a fast exit strategy.

12:29PM 5         Jim's short notice of cancer left us without an
6    accountant or CFO position.  We immediately recognized this
7    and put out ads in multiple platforms to look for
8    applicants.  During this process, I was tasked with
9    understanding the payroll process as we knew a new applicant
12:29PM 10   would not be able to be trained by Jim since he only had two
11   weeks to live because of his terminal cancer.

12        Jim was somewhat of a sloppy person, but to know
13   Jim was to love Jim.  His sloppiness would show up in his
14   daily work and would be explained by a Microsoft Excel error
12:29PM 15   or a formatting error or something as such.  There was
16   always a reason why something didn't add up.

17        Jim rarely produced documents from our accounting
18   system, NetSuite.  Instead, it was always out of an Excel
19   document where he could manipulate the numbers as he needed
12:30PM 20   to to make a document add up.  Jim would badmouth the
21   software and produce -- I just said that, sorry.  This
22   information was mostly provided in monthly financial
23   meetings.

24        So back to payroll training.  I sat down with Jim
12:30PM 25   to process the previous payroll period.  This was on a

83

12:30PM 1   Tuesday, 1-10 of '23, Jim's last day at White River as he
2   was leaving on a cruise with all his family members.  I made
3   detailed notes and took screenshots to help me document this
4   process for the next position and payroll in two weeks.
12:30PM 5   These notes were invaluable to me to help me process the
6   next payroll and help us train our new accountant, Ryan.
7   These notes are what led Ryan and I to look at previous
8   payroll registers, which were never provided to the Johnsons
9   before, and see where Jim had given himself an enormous
12:31PM 10  commission on the previous payroll, the last payroll he was
11  there at the company.  And within just a few minutes, we had
12  discovered parts of Jim's embezzlement schemes.
13        Ryan and I spent the next four to five days
14  gathering different information to support this.  And the
12:31PM 15  following Sunday, Ryan and I called a meeting with all
16  Johnsons to reveal what we discovered.  This then led to
17  discoveries of multiple other schemes where Jim was stealing
18  funds from the company, payroll, 401K, Matrix, Dromborg
19  LLCs.
12:31PM 20        Jim's actions stole from the company, from Bruce
21  and Joan directly, from Ben and myself, and from the
22  employees indirectly.  This huge loss of funds kept the
23  company from being as strong as it should have.  These
24  actions caused the company to take on debt, which we still
12:31PM 25  have today and will for the immediate future.  It directly

12:31PM 1    affected our employees as raises could not be considered.

2    It prevented the company from expanding or doing needed

3    repairs or improvements.

4         Remember the cruise?  That was also a lie.  The

12:32PM 5    company made a substantial donation to help fund Jim's last

6    time with family.  On Wednesday, the -- I'm sorry -- on

7    Wednesday, January the 11th, Jim was supposed to be driving

8    to Galveston for his cruise.  Jim had stopped by the office,

9    said he forgot to show me something on payroll.  And what he

12:32PM 10   really did was pay off his 401K so he could cash it out to

11   the tune of about $90,000.

12        Jim stole from my parents who had put in 50 years

13   of their life in this company, had them consider bankruptcy,

14   take money out of their 401K so that payroll and other

12:32PM 15   expenses could be paid.  He took every penny he could get

16   his hands on.  Jim is a sloppy, greedy thief and I hope he

17   gets the full sentence that the law allows.  Thank you.

18        THE COURT:  Mr. Johnson, remind me, at that

19   going-away party, or in conjunction with him leaving, did he

12:33PM 20   get some sort of severance or bonus or some sort of payment?

21        MR. JESSE JOHNSON:  There was a check.  I believe

22   it was to the tune of about $6,500 that was for the cruise

23   for him and his family to go take.

24        THE COURT:  Okay.

12:33PM 25        MR. JESSE JOHNSON:  That was presented to him at a

12:33PM 1    company party where all the employees were present.

2            THE COURT:  Thank you, sir.

3            Mr. Elser?

4            MR. ELSER:  Your Honor, I think the best way to

12:33PM 5    describe this case is, we had a family company.  Mr. Fant

6    was made part of that family by the Johnsons.  And he took

7    that trust that they gave to him and he used it to just

8    steal from them in every which way that he could, not only

9    affecting them financially, but as you can see, having more

12:34PM 10   of an effect than that.

11           The business, you're trying to make a business work

12   that you had started from scratch.  Your whole family's

13   livelihood, your son's, you and your wife's living depends

14   on it.  And it's not doing well and you don't know what to

12:34PM 15   attribute that to until you find out it's one of your best

16   friends, one of the members of the employment family, who is

17   stealing from you.

18           So I think the Court understands the facts of this

19   case make for an egregious violation of trust that was

12:34PM 20   placed in Mr. Fant.  And so we would ask the Court to

21   sentence him at a guideline sentence, but at the top of the

22   guidelines in this case.  Thank you, Your Honor.

23           THE COURT:  Thank you.  Mr. Alfaro?

24           MR. ALFARO:  Thank you, Your Honor.

12:35PM 25           For the reasons in our sentencing memorandum, Your

12:35PM 1    Honor, and some of the issues I'll address today, we are

2    respectfully requesting that this Court impose a slight

3    downward variance from the advisory guideline range as

4    sufficient, but not greater than necessary, under the

12:35PM 5    3553(a) factors.

6          I think that this Court typically starts off when

7    considering the nature of this offense comparing its

8    relative seriousness to cases overall.  I think we can all

9    agree that while this case is very serious, it's towards the

12:36PM 10   less serious end from cases that we more routinely see or

11   that are presented before this Court, meaning it's not

12   murder or drugs or violence or weapons or sex offenses.

13   These white-collar offenses are very serious, but I think on

14   balance here, it's towards the less serious end.  However,

12:36PM 15   we will concede in the context of fraudulent cases this

16   Court typically sees, there are certainly several

17   aggravating factors here involving a large loss amount on a

18   local business.

19         To that I would say, Your Honor, Mr. Fant is

12:36PM 20   ashamed of his conduct.  He's remorseful.  He's been living

21   with this shame and felony conviction since this

22   investigation came to fruition.  He's going to have to spend

23   the rest of his life paying back this money in any way that

24   he can.  Every check he writes, every monthly payment he

12:36PM 25   makes, every piece of property seized, is a constant

12:37PM 1    reminder how he has harmed these victims.  And a guideline

2    sentence, Your Honor, will just delay that form of

3    punishment for Mr. Fant to begin to even try to make any

4    effort to make it right.

12:37PM 5            I know that this Court has overruled our

6    sophisticated means enhancement, and to that, Your Honor, I

7    just feel the need to simply add that I forgot to mention

8    earlier that every single one of Mr. Fant's payroll

9    statements showed a commission payment.  Every single

12:37PM 10   transfer from the Matrix account, every single transfer from

11   the Dromborg account, went from that account to Mr. Fant's

12   personal account.  And the reason why I bring that up is not

13   to minimize his conduct, but when we are talking about this

14   enhancement for sophisticated means as compared to other

12:37PM 15   individuals, it wasn't as if he was engaging false

16   identities in corporate shells that just made it more of a

17   mess to figure out where the money was going.  It was clear

18   once you started to peel back the first few layers where all

19   of this money was going.

12:38PM 20           Your Honor, we have detailed in our memorandum the

21   significant medical issues that Mr. Fant and his family have

22   faced during the course of this conduct.  And that's not to

23   justify, again, what he did, but I think it provides

24   mitigating context here in light of other cases that this

12:38PM 25   Court may have seen involving these large amounts of loss.

12:38PM  1    There is nothing to indicate that Mr. Fant was living an

2    extraordinary, extravagant lifestyle.  He waived his Grand

3    Jury rights.  He agreed to be charged by information,

4    accepted responsibility early through this case, so I think

12:38PM  5    those are important mitigating factors.

6            Turning to Mr. Fant's character, his history, we

7    see a person that, I believe ultimately justice is not going

8    to be served by sending a 60-year-old man with significant

9    medical issues to an extensive prison sentence.  I don't

12:39PM 10    believe that benefits anyone.  We have detailed his medical

11    situation and conditions with some records provided in our

12    sentencing memorandum, Your Honor.  But he's been a diabetic

13    for most of his life.  He takes four to five insulin shots

14    daily.  And then the underlying effects of diabetes;

12:39PM 15    fatigue, ketoacidosis, kidney failure, slow-healing wounds,

16    infections and sepsis.  All these things Mr. Fant has

17    experienced even during this case, the pendency of this

18    case.  The inability to stand for long periods of time,

19    difficulty walking, kidney disease, coronary artery disease,

12:39PM 20    hypertension, neuropathy, obesity, arthritis.  A litany of

21    medical conditions that require multiple medications.  And

22    that's just to say that physically and mentally, an extended

23    prison sentence will be harsher on Mr. Fant as compared to a

24    general defendant that doesn't have this age in combination

12:40PM 25    with these medical conditions.

12:40PM  1          The other concern that I have that we see sometimes

2    is the lapse of medication provided to inmates during

3    lockup.  Will they give them all their medications, or will

4    they try to substitute something that will be easier to give

12:40PM  5    to these inmates?  How will that affect or exacerbate

6    Mr. Fant's medical situation?  I think all of those are

7    mitigating circumstances this Court can consider.

8          Outside of this eight-year conduct, Your Honor,

9    Mr. Fant has been a law-abiding citizen.  He ticks almost

12:40PM  10   every objective indicator that research suggests that he

11   will not recidivate or be less likely to recidivate and will

12   not be a danger to the public.  He's 60 years old, and the

13   older an offender is, the less likely they are to

14   recidivate.  He has no criminal history.  But it's not just

12:41PM  15   that; he's a zero-point offender.  The fraudulent defendant

16   cases are typically less likely to recidivate.

17         He's a high school graduate and a college graduate.

18   Outside of his employment with White River, which began in

19   '99, he had employment before that for several years.  He's

12:41PM  20   got significant family support with his wife and adult

21   children.  He's been on pretrial release for seven and a

22   half months, no violations, no issues, not engaging in

23   fraudulent activities.  He's been completely compliant with

24   this Court's conditions and demonstrated respect for this

12:41PM  25   Court's conditions and laws and rules.

12:41PM 1          And I think all of these considerations warrant a

2    downward variance.  The Court even alluded to another form

3    of collateral punishment.  A felony conviction likely will

4    result in Mr. Fant losing his CPA license.

12:42PM 5          THE COURT:  He was, in fact, a CPA?

6          MR. ALFARO:  Yes, Your Honor.  I believe he was,

7    yes.

8          THE COURT:  And at the change of plea hearing, did

9    I instruct that he notify the CPA licensing board?

12:42PM 10         MR. ALFARO:  I don't remember, Your Honor.

11         So when we think what is just, what's not greater

12   than necessary to deter a first-time offender who owes a

13   large amount of money to the victims here, to protect the

14   public from a 60-year-old man with no criminal history and

12:42PM 15   serious medical conditions, we submit it's not a guideline

16   range sentence, Your Honor.  The combination of the nature

17   of these factors in balance with the harm to the victims and

18   the specific unique characteristics of Mr. Fant, we believe

19   a downward variance is appropriate.

12:42PM 20         We are respectfully requesting this Court not

21   impose a fine given the extensive amount of restitution that

22   Mr. Fant is liable for.  And lastly, Your Honor, we are

23   respectfully requesting this Court consider that the Bureau

24   of Prisons designate him to a medical facility.

12:43PM 25         That's all I have, Your Honor.

12:43PM  1          THE COURT:  I have a few questions, Mr. Alfaro.
2    And actually the first question is for either you or
3    Mr. Elser.

4          Based on what I have heard, he was getting pay
12:43PM  5    stubs that showed the full amount that he was being paid.
6    The commission part of it, obviously, he didn't have
7    authority to do.  But when he got the W-2 at the end of the
8    year, was he attaching a W-2 for that full amount and paying
9    taxes on the full amount?  What does the discovery in the
12:43PM  10    case show?

11          MR. ALFARO:  I don't know, Your Honor.

12          MR. ELSER:  Yes, Your Honor, he was.

13          THE COURT:  Second question for you, Mr. Alfaro.

14          So a sizable chunk of the $5-plus million went to
12:44PM  15    pay taxes.  Where is the rest of it?

16          MR. ALFARO:  Your Honor, I don't have any
17    indication.  I believe the rest, the large portion of that
18    money, as we detailed in our sentencing memorandum, went to
19    medical expenses that insurance didn't cover among himself,
12:44PM  20    his wife, and his children, all who suffered repeated ER
21    visits.

22          THE COURT:  Did they have insurance through White
23    River?

24          MR. ALFARO:  I don't know who their insurance
12:44PM  25    coverage was, Your Honor.

12:44PM 1          THE COURT:  Most policies have stop losses on them.

2          MR. ALFARO:  Well, Your Honor, so Mr. Fant's -- I

3    could be wrong -- but if I remember correctly, one of

4    Mr. Fant's sons, who has also the same condition, does not

12:45PM 5    have health insurance through his employer at all.

6          THE COURT:  How old is that son?

7          MR. ALFARO:  I'm sorry?

8          THE COURT:  How old is that son?

9          MR. ALFARO:  I don't remember the age.  He's an

12:45PM 10   adult, Your Honor.

11          THE COURT:  Medicaid?

12          MR. ALFARO:  No, Your Honor, I don't believe -- I

13   have no information of whether Medicaid, whether he has

14   Medicaid or not.  The only information that I have is that

12:45PM 15   minimal health insurance, large medical bills not covered by

16   whatever coverage these family members had.

17          I will say, Your Honor, obviously not accounting

18   for the $5 million over the course of eight years of a

19   lifetime of medical bills, but substantial assets have been

12:45PM 20   seized as detailed in the forfeitures, the land, and the

21   cars, and the cash deposit, things like that.

22          THE COURT:  Mr. Elser, what's the total value of

23   the forfeiture that's been seized?

24          MR. ELSER:  So, Your Honor, I think there was about

12:46PM 25   $90,000.  I think I have it here.  Just on the issue of the

12:46PM  1   payment of the medical expenses, Your Honor, it would have

2   been easy enough to prove what money went. I mean, there

3   should be payment records to medical expenses. I think a

4   lot of the medical issues that were raised in the brief were

12:46PM  5   back many years, even before the embezzlement began. So I

6   just would not -- I'm not -- I wouldn't take Mr. Fant's word

7   for the fact that the money went to medical expenses.

8                   THE COURT:  I got it.

9              MR. ELSER:  There was -- it was 93,000, almost

12:47PM 10   94,000 in cash, a tennis bracelet, a heart pendant, hoop

11   earrings. And a Kubota tractor that I believe was purchased

12   for around $25,000, so whatever it would bring in a sale is

13   not going to be that much.

14                  THE COURT:  So a $25,000 tractor.  $93,000 in

12:47PM 15   Helzberg jewelry, diamonds.  What else?

16              MR. ELSER:  There was another 6,000 I missed, Your

17   Honor, that was seized from a bank account, so that's about

18   I would say $125,000.  I don't believe that the jewelry, I

19   don't know how much the jewelry is worth.  The impression I

12:47PM 20   get, it's not going to bring that much money, the items of

21   jewelry that were seized.  So I would anticipate, at most,

22   150,000, something like that.  And that would be probably at

23   the high end.  That would be my estimate.

24                  MR. ALFARO:  I would object to that just a little

12:48PM 25   bit, Your Honor.  It's $100,000 cash, land that was seized

12:48PM 1    in the civil case, $160,000.

2            THE COURT:  Remind me where the 100,000 in cash

3    comes from.

4            MR. ALFARO:  $93,845 in cash from the safety

12:48PM 5    deposit box.

6            THE COURT:  I thought that was the value of the

7    jewelry.

8            MR. ALFARO:  No, Your Honor, that's specific cash.

9    Also $6,311.90 from a bank account.  So $6,000 from the bank

12:48PM 10   account, 93,845 from a safety deposit box, plus the tennis

11   bracelet, plus the heart pendant, plus the hoop earrings,

12   tractor, a 2020 Hyundai Kona, plus the land.

13           THE COURT:  What was the land?

14           MR. ALFARO:  I believe it was purchased for

12:48PM 15   $160,000, Your Honor.

16           MR. ELSER:  I had left that out, Your Honor.  That

17   is true.  And I don't know the values on that as to what

18   that will bring.

19           MR. ALFARO:  And I'm not attempting to suggest

12:49PM 20   that's anywhere near the $5,000 (sic) loss amount, Your

21   Honor.

22           THE COURT:  I just want to know, all in, what does

23   that add up to?

24           MR. ALFARO:  Geez, Your Honor.  The car, I have no

12:49PM 25   clue what the value of the car.  So I can't quantify the

12:49PM 1    2020 Hyundai Kona, the tennis bracelet, the heart pendant

2    and hoop earrings.  So without those amounts, I see 1, 200,

3    685; $285,000.

4            THE COURT:  $285,000?

12:49PM 5            MR. ALFARO:  Yes, not including the car and the

6    jewelry.

7            THE COURT:  Okay.  Thank you.

8            MR. ALFARO:  Thank you, Your Honor.

9            THE COURT:  Mr. Fant, would you like to make a

12:49PM 10   statement?

11           THE DEFENDANT:  No, Your Honor.

12           THE COURT:  That's fine.

13           So we return to this framework that I explained

14   earlier.  The Court begins with the advisory guideline

12:50PM 15   recommendation of 57 to 71 months and then we go to all of

16   the factors that I summarized in the second step of the

17   framework, and I have applied all of those factors.  And now

18   I have to make a decision about whether the guideline range

19   gets it right or whether it gets it wrong, as Mr. Alfaro is

12:50PM 20   suggesting.

21           When I apply these, we call them the 3553(a)

22   factors.  Those are all the other factors that I mentioned.

23   And when I apply those, I think that some of them are viewed

24   as very aggravating, while there's certainly some mitigating

12:50PM 25   context here.

12:51PM  1          On the aggravating side, this Court has sentenced a
2    bunch of fraudsters over the years.  Some of them have
3    elaborate schemes where they are trying to sell stuff that
4    doesn't exist or doesn't work as they make representations
12:51PM  5    about.  You, Mr. Fant, are a fraudster as well, but the
6    nature of your fraud is, you weren't trying to sell somebody
7    something under false pretenses.  You're just a thief.  You
8    didn't use a gun.  You used a keyboard.  But you engrained
9    yourself into the trust of people who, best I can tell, kind
12:52PM 10    of sort of looked at you as a trusted family member, the way
11    any small business owner would, to a long-term, valuable
12    employee.
13          And what did you do with their trust?  You stole
14    from them.  And, I mean, sometimes we see embezzlers and
12:53PM 15    they have different motivations for stealing.  We had one
16    lady who had a gambling addiction and so she embezzled
17    money.  We had another woman who wanted to buy her kids more
18    trendy clothes, so she stole from a bank.  I don't know that
19    I can recall somebody who falls in the embezzler, just the
12:53PM 20    straight-up thief type of fraud, that I have ever sentenced
21    where the offense conduct was as egregious as it is in this
22    case.
23          You started off small, and year after year after
24    year after year after year after year after year after
12:54PM 25    year -- I think that's eight times -- you stole more money

than you did the year before.  The abject greed are the likes that I just actually haven't ever seen before.  You had this one main scheme of paying yourself a commission.  But that wasn't enough, even when it got to the point that it was hundreds of thousands of dollars a year.  I mean, your salary was somewhere between 60 and $72,000.  So these commissions on an order of magnitude greatly dwarf -- they were actually a full order of magnitude in some years -- more than your salary was.  And even that wasn't enough.  So you concocted these other schemes.

Everyone else is having to pay into their own 401K, but, Mr. Fant, well, I'm going to have the company pay my 401K.  Then you withdrew some money from your 401K.  Most people have to pay that back.  The IRS doesn't like it when you don't pay it back, so apparently you paid yours back.  But you didn't use your money.  You doubled down on the 401K scheme and you used your employer's funds to pay your 401K loans back.  When these people who treated you like family, as family businesses do to their trusted employees, you created the illusion that the company wasn't doing that well.  We're just not doing enough sales here.  We are going to have to find other means of cash flowing this whole deal.  And on your advice and your silence as to what was really going on, you let them tap into their own 401Ks, knowing what you had been doing with your 401Ks.  You talked about

12:57PM   1   property that they could sell that would help the business.
          2   And when they liquidated their 401Ks, how you viewed that,
          3   how you viewed doing that to make payroll, is it gave you a
          4   bigger pot of money to steal from than it would have been if
12:57PM   5   they didn't do that.  And when they sold property, you
          6   literally just made bank transfers and stole it.  Stole it,
          7   just outright stole it.  You had access to the account,
          8   transferred it to yourself.

          9       The number of different schemes that you came up
12:58PM  10   with, the mentality of, even these large amounts of money
         11   that I'm stealing is not enough for me, you had insatiable
         12   greed.  You were a glutton for money.  And you would walk
         13   into work every day and look these people in the eye.  Sir,
         14   I find that to be extraordinarily despicable.  All of this
12:58PM  15   makes you a horrible person.

         16       On top of that, there's additional context that is
         17   very important here.  This Court has sentenced embezzlers
         18   who are, in the big scheme of things, relatively low-level
         19   people.  People that work in a county clerk's office, people
12:59PM  20   who work in corporate America, but they have -- some aspect
         21   of their job gives them access to an account and they have
         22   falsified some vouchers or something like that.  I literally
         23   do not understand how you could come to work every day
         24   knowing what you were doing.  I mean, most people would
1:00PM   25   drive to work and think, they would be stressed out about

it.  Is today the day that I'm going to get caught?  On your drive in, you were probably thinking about, where is some other pot of money that I can steal.  Your mindset just is absolutely beyond me.  But the added context here that makes all this worse is that you were the CFO, chief financial officer.  Fiduciary responsibility.  A lot has been said today about, well, this was all on the books.  It was on every single pay stub.  All somebody had to do was look.  When you owe fiduciary duty as a corporate officer, sometimes there's a duty to speak.  And I've not heard one shred of evidence, no one has suggested that you ever asked the Johnsons if you could have a commission.  But I'm pretty sure you know that if you asked them if you could have 10 times your salary as a commission, I'm pretty sure you knew what the answer would be.  But as a fiduciary, you had a duty to speak, and you remained silent.  I guess the attitude is, if someone could look at the books and figure it out, no harm, no foul.  Their silence must be endorsing what I'm doing.

        Not only were you a corporate officer with a duty to speak, you were a certified public accountant that the State of Arkansas, or wherever you're licensed, entrusted with a privilege; the privilege of practicing public accountancy.  Sir, I am unaware of any rule of accounting that says that it's okay for a certified public accountant

1:03PM  1   to steal money from the people whose funds that you're

2   accounting for.  Pretty sure there is something that says

3   the opposite of that.  A CPA is a fiduciary to their

4   clients, just like the corporate officer is to their

1:03PM  5   employer.  You received an enhancement for abusing a public

6   or private trust, but I don't think that two levels on these

7   facts comes anywhere near holding you fully accountable for

8   the way that you abused those positions.  It's grotesque

9   what you did.

1:04PM  10          The probation officer assessed a substantial

11  financial hardship assessment.  Your attorney made some good

12  arguments as to why that technically didn't apply here, that

13  criteria just didn't exactly fit the facts.  But that does

14  not mean that this family that treated you like family

1:04PM  15  didn't suffer a financial impact.  They did; a great one.

16  And you have accepted responsibility.  I'm glad you did.

17  That's one of the few mitigating things I see here.  But I

18  just don't know whether you have any remorse whatsoever for

19  what you have done.  I don't see any evidence of any

1:05PM  20  remorsefulness.

21          Sometimes when people steal, they feel guilt, and

22  they will sell whatever it is that they have, liquidate

23  whatever it is that they have, and they will come bring a

24  check.  Sometimes it's a check for the full amount of the

1:05PM  25  fraud.  Sometimes it's a pittance, but at least they thought

1:06PM 1    to bring a check because they felt badly.  You have brought

2    nothing.  You have brought nothing and no explanation where

3    5.4 million, less taxes, less the 285,000 plus some jewelry,

4    where did all that go?  Medical expenses.  Well, I don't

1:06PM 5    think so.  You had health insurance and there's a stop loss

6    on most insurance policies.  I don't know what yours was,

7    but at some point, whether it's 10,000, 20,000, 50,000,

8    there's a stop loss and then the insurance company pays for

9    everything.  So I'm not buying that one.

1:07PM 10         I know you liked to deposit cash at that bank in

11    Oklahoma.  I know you liked to get cashier's checks.

12    There's evidence of at least one.  So I'm kind of left to

13    believe here that there's cash buried somewhere.  And you

14    come forward today with nothing and suggest to this Court

1:07PM 15    that, well, don't fine me.  Don't do this.  Don't do that.

16    I don't have any money.  I don't believe that.

17         We've already talked about the egregious and

18    extraordinary abuse of trust.  There's something else here

19    that I just have never heard of before.  You have built this

1:08PM 20    great big house of cards.  You know that at some point,

21    that's not sustainable.  You know that at some point, you

22    are going to get caught.  And I bet you devoted a lot of

23    your thinking to some scheme that you could exit this and

24    not get caught, or at least get away before you got caught.

1:08PM 25    Instead of looking the Johnsons in the eye and telling them

1:08PM  1    what you had done and saying, oh, my gosh, this is just

2    eating me up, you stewed up and concocted a plan to tell

3    them that you had cancer and that you had a short time to

4    die.  Are you kidding me?  Apparently, sir, you really did

1:09PM  5    that.  And you let them throw you a party.  You got cake and

6    apparently four grand -- or whatever the amount was -- so

7    you could go on a cruise.  Knowing that you stole

8    $5.4 million, you let them bring you cake and give you

9    money.  I'm sure you drove home that day and said, I guess

1:10PM 10    I'm getting my cake and eating it too.  Not many people get

11    to do that.

12               Mr. Fant, the aggravating circumstances factually

13    here are extraordinary in my mind.  Mr. Alfaro is correct

14    that in the big scheme of things, fraud is not on the same

1:10PM 15    plane as being a heroin kingpin distributor.  It's not on

16    the same level of seriousness as being a hands-on child sex

17    offender.  It's not on the same plane as being an illegal

18    arms dealer who has committed violence when law enforcement

19    showed up.  It's not.  And I acknowledge, fully acknowledge

1:11PM 20    Mr. Alfaro's point.  But that doesn't mean that stealing

21    $5 million from somebody is not a serious offense.  It just

22    means that it's not as serious as those other crimes.  And

23    as I often remark, the 2B1.1 guideline gets it wrong a lot

24    of times, because it starts out with such a relatively low

1:11PM 25    guideline range compared to the actual seriousness of the

1:12PM  1   hardships that were created and the level of criminal

2   scheming that has gone on.

3   The government can prosecute somebody for having as

4   little as 5 grams of actual methamphetamine, and depending

1:12PM  5   on how they prosecute that case, there's a minimum of

6   five years that they have to do in prison.  Five grams

7   actual methamphetamine, one sale.  I don't know what the

8   multiple is, how many zeros you would have to add if we

9   compared that to the $5 million that you stole over eight

1:12PM 10   years, and yet the guidelines here would suggest a sentence

11   around that five-year mark.  And I just find that that is

12   too low.  That is way out of proportion to the starting

13   point and what it should be, based on its relative

14   seriousness.

1:13PM 15   Now, there are some mitigating facts and

16   circumstances, although I will let you know, I kind of had

17   to scour the record for them.  Frankly, most of the people

18   that are sitting in your chair, Mr. Fant -- not all of them;

19   certainly the white collar criminals, most of them have had

1:13PM 20   some benefits in life -- but most of the drug dealers didn't

21   have the benefit of a good education.  They didn't have the

22   benefit of being smart enough to pass all three or four

23   sections of the CPA test.  They don't hold any professional

24   licenses.  They don't have jobs that pay them 60 or $70,000

1:14PM 25   a year.  Most of them didn't graduate from high school or at

1:14PM  1   best have a GED.  And they were raised in an impoverished

2   situation where frequently violence was committed upon them

3   and they were introduced to alcohol and drugs at an early

4   age.

1:14PM  5       To whom much is given, much is demanded.  And you

6   had every possible benefit going for you in your

7   professional life.  So I've had to search for the mitigating

8   circumstances here, because there aren't a whole lot of

9   them.  Some of the largest ones that I have been able to

1:15PM  10  identify are the fact that you have no prior criminal

11  history.  And that's good.  That's mitigating.  You have

12  been rewarded for that by getting the zero-point offender

13  reduction.

14      As bad as the offense conduct was, you didn't carry

1:15PM  15  a gun, nor did you pull it, nor did you point it, nor did

16  anyone get physically hurt.  Unless of course you account

17  for all of what the stress to the Johnsons has caused them,

18  the turmoil that that caused.  But I'll give you the fact

19  that it's mitigating here that you didn't pull a knife, you

1:16PM  20  didn't pull a gun, and what you did is considered a

21  nonviolent crime.  That's mitigating.

22      I will also give you as very mitigating here that

23  you came in at the very first opportunity when the trough

24  opened up and you pled to an information.  That's very

1:16PM  25  mitigating.  You accepted responsibility.

1:16PM  1          Another thing that I find obviously very mitigating
2       here -- and Mr. Alfaro has even attached some recent medical
3       records -- you're in poor health.  You're a long, long-time
4       diabetic, and eventually diabetes catches up to you, and you
1:17PM  5       have all sorts of consequences of diabetes that are catching
6       up to you; sores and neuropathy, I'm sure, diabetic wounds,
7       some kidney issues.  You have high blood pressure.  Perhaps
8       some heart issues.  You had an abnormal EKG last year.  You
9       were in the hospital last month, or back in March, I think
1:17PM  10      it was.  So you're not in good health and you're 60 years
11      old.  So at your station in life -- and what I mean by that
12      is 60 years old and you have a whole bunch of medical
13      problems -- people like that generally don't do super well
14      in the Bureau of Prisons' environment, okay.  So I have to
1:18PM  15      take that into account as mitigating here, and I have.
16          I also have to take into account sentencing
17      disparity.  Mr. Alfaro has pointed me to some cases that he
18      thinks are comparable.  I've considered what we call the
19      JSIN data on a national level.  Of course what's in the PSR
1:19PM  20      isn't right, but I know or have a pretty good idea that the
21      JSIN data would show sentences of something less than 57
22      months, is my great suspicion.  And so I'm aware of that and
23      I have taken that into consideration.
24          I've also considered some additional comparators.
1:19PM  25      Jody Davis is somebody that didn't plead guilty and he had a

1:19PM 1    prior federal sentence, so he's different from you in that
2    sense.  But he's kind of on par with you in the sense that
3    he could look you right in the eye, tell you something that
4    wasn't true, and steal your money and have absolutely no
1:19PM 5    remorse about it.  In that regard, he's similar to you.  He
6    was a 121 to 151.  I varied up to 180.
7        The Court recently sentenced a guy by the name of
8    John Nock.  He wasn't an embezzler.  He was a con man sort
9    of fraudster.  He would sell people stuff.  He would sell
1:20PM 10    them a pack of lies.  He too had the ability to, like you
11    do, to look somebody straight in the eye and know that they
12    are stealing their money and just kind of smile.  Now,
13    Mr. Nock is different from you in that his guideline --
14    because of all the enhancements that he received -- much,
1:21PM 15    much, much greater than yours, like four times greater than
16    yours.  So I actually had to end up varying downward in
17    Mr. Nock's case, but Mr. Nock was accountable for somewhere
18    between 12 and 15 million of actual loss.  He got a sentence
19    of 250 months.  And ya'll's period of fraud, the temporal
1:21PM 20    length of it, was about the same.
21        I also remember the sentencing of a guy by the name
22    of Jim Bolt.  He was not an embezzler.  He was a con man.
23    But ya'll are a lot alike.  His guideline range was 57 to 71
24    months.  He too had various schemes, and he was very
1:22PM 25    cold-blooded and calculated and could rationalize anything.

1:22PM 1    Now, con man.  You're an embezzler, so that's different.  He

2    had had a prior conviction.  You don't.  He had medical

3    problems.  You have medical problems.  You're 60.  He was

4    about 60.  The Court varied up in his case and sentenced him

1:22PM 5    to 100 months.

6          And I have considered the comparators that

7    Mr. Alfaro suggested who were embezzlers -- embezzlers with

8    low guideline ranges -- and none of them were officers of

9    their companies.  Actually, there was a court clerk, a city

1:23PM 10   court clerk, so I guess you could consider him an officer of

11   a company.  None of them had professional licenses.  None of

12   them had people who were relying on their professional

13   advice in the way that an accountant or a lawyer or a doctor

14   has clients who rely on their professional advice.  None of

1:23PM 15   them had that.

16          Mr. Fant, after considering all of the aggravating

17   facts and circumstances and weighing those against all of

18   the mitigating facts and circumstances and taking fully into

19   account the need to avoid disparity in sentencing among like

1:24PM 20   defendants, this is a case in which I think the guideline

21   range gets it wrong.  I think 57 to 71 months is too low.

22   And you've got a lot of health issues and you're 60 years

23   old, but the BOP has medical centers.  I'm going to

24   recommend that you go to a medical center and they can

1:24PM 25   actually take reasonably good care of you.  I don't know

1:24PM 1    what Mr. Alfaro is talking about, about you may not get your
2    medicines.  From time to time, there may be a glitch at the
3    county jail, but I've been to lots of Bureau of Prisons and
4    I have visited their pharmacies.  Their pharmacies are
1:25PM 5    actually typically run by the National Health Service and
6    licensed pharmacists and they have pretty good formularies.
7    So I think that you will be well cared for.  I don't think
8    that your condition -- one thing we know is, you don't have
9    terminal cancer.  Sometimes terminal cancer, when you really
1:25PM 10    need hospice, the Bureau of Prisons, they may not be the
11    best place to go if you need hospice.  And fortunately --
12    and unlike what you told to the Johnsons -- you're not dying
13    of bone cancer after all, and I think the BOP can take care
14    of you.  Now, I have weighted that very heavily as a
1:25PM 15    mitigator here, but I'm confident that it's been taken into
16    the mix and that the guideline range is still too low.
17         Mr. Fant, it is the judgment of this Court that you
18    are to be sentenced to the Federal Bureau of Prisons for a
19    period of 108 months on Count One of the information.  The
1:26PM 20    Court will impose a sentence of 108 months on Count Two of
21    the information.  Those terms shall be run concurrently.
22         Upon release from the custody of the Bureau of
23    Prisons, you shall be placed on a period of three years of
24    supervised release as to each count, however, those terms
1:27PM 25    shall run concurrently.

1:27PM 1          With regard to a fine, in consideration of the

2     amount of restitution here, the Court is not going to impose

3     a fine.  The Court is going to impose restitution in the sum

4     of $5,267,292.38.  The Court will also impose a special

1:27PM 5     assessment of $100 per count for a total of $200.

6          Working backwards a little bit as it relates to the

7     period of incarceration, the Court will recommend that

8     Mr. Fant's medical condition be evaluated by the medical

9     designation team to determine whether or not he should be

1:28PM 10     placed in a federal medical center facility.

11          With regard to supervised release, the terms will

12     be as follows:  Within 72 hours of your release, Mr. Fant,

13     you must report in person to the probation office in the

14     district to which you are released.  While on supervised

1:29PM 15     release, you shall not commit any federal, state, or local

16     crimes.  You shall be prohibited from possessing a firearm

17     or other dangerous device.  You shall not possess a

18     controlled substance and you must comply with the mandatory

19     DNA collection provisions found at Section 3583(d) of the

1:29PM 20     criminal code.  The Court will waive the drug testing

21     provisions of that section.

22          The defendant must also comply with all of the

23     standard conditions of supervised release.  Those were set

24     out in your plea agreement and you agreed to those, and so I

1:29PM 25     will capture those and put those in your judgment.

1:29PM 1    Additionally the Court will impose the following special

2    conditions:

3        Number one, until the financial penalties are paid

4    in full, the defendant shall not incur any new debt, nor

1:30PM 5    establish any bank or credit accounts unless having received

6    the prior approval from the probation office, and he must

7    make any information concerning his financial status

8    available to the probation officer upon request.

9        Number two, the defendant shall allow and give

1:30PM 10    consent to the probation office to make contact with any of

11    his financial institutions to confirm that the defendant is

12    complying with the previously ordered special condition.

13        Number three, the defendant shall submit his

14    person, residence, place of employment, and vehicle to a

1:30PM 15    search to be conducted by the U.S. Probation Office at a

16    reasonable time and in a reasonable manner based upon any

17    reasonable suspicion that evidence of any violation of the

18    conditions of supervised release might thereby be disclosed.

19        Number four, if he's not already done so, while on

1:31PM 20    supervised release, Mr. Fant must provide notice that he has

21    informed all of his state licensing boards of his conviction

22    and his status of being on supervised release.

23        Next, while on supervised release, Mr. Fant shall

24    not hold a job in which he has access or control to the

1:31PM 25    monies of his employer or to the monies or accounts of third

1:31PM 1    persons.

2    With regard to the special assessments and the

3    restitution, payments that are made shall first be applied

4    to the special assessments and then to the restitution

1:32PM 5    obligation.  Mr. Fant, these financial obligations are due

6    and payable immediately, so if you do have assets, if you do

7    have cash somewhere, these are due and payable immediately.

8    If you can't pay all of that amount upfront, you

9    will be required to make payments.  While you're

1:32PM 10   incarcerated, that amount shall be at the rate of up to

11   50 percent of your available funds in accordance with the

12   Bureau of Prisons Inmate Financial Responsibility Program.

13   During any period of residential reentry programming, your

14   payments shall be equal to 10 percent of your gross monthly

1:33PM 15   income.

16   The payment of any remaining balance shall become a

17   condition of supervised release and shall be payable in

18   monthly installments of $2,000, or 10 percent of the

19   defendant's gross monthly household income, whichever is

1:33PM 20   greater, with the entire balance to be paid in full no later

21   than one month prior to the end of the period of supervised

22   release.

23   This is the Court's intended sentence.  Mr. Alfaro,

24   are you aware of any legal reason why it should not be

1:33PM 25   imposed?

1:33PM 1          MR. ALFARO:  Yes, Your Honor.  May I briefly reply?

2          THE COURT:  Please.

3          MR. ALFARO:  Thank you, Your Honor.

4          Your Honor, to the extent to preserve the record

1:33PM 5 for Mr. Fant's appeal, we would object to the variance

6 itself, the upward variance, as well as the degree of upward

7 variance for the reasons we have cited today in court and

8 for the reasons in our sentencing memo.  Particularly where

9 the Court was comparing Mr. Fant, a first-time offender, to

1:34PM 10 other individuals who have prior convictions and/or a larger

11 loss amount with those similar sentences.  We would object

12 for all those reasons, in addition to those cases the Court

13 cited.

14          And secondly, Your Honor, to the extent that the

1:34PM 15 Court formed a personal opinion regarding the aggravated

16 circumstances in this case, to the extent that it called

17 Mr. Fant a horrible person, I would submit that that would

18 be an *ad hominem* personal attack inconsistent with the

19 3553(a) factors.  I can't quantity it more than that, just

1:34PM 20 to say that statement I think is something I needed to

21 object to, to preserve any of Mr. Fant's rights.

22          That's all I have, Your Honor.

23          THE COURT:  Well, perhaps Mr. Alfaro is correct, to

24 a certain extent.  To the extent that those words could be

1:35PM 25 taken out of context and heard as a personal *ad hominem*

1:35PM   1   attack, that would be inappropriate for a Judge.  And if

2   that was how it sounded to your ears, I apologize.

3            The content in which I meant it is that if you

4   layer upon layer all of the offense conduct, all of the

1:36PM   5   schemes, all of the different ways that you were sucking

6   money from this family that had entrusted you and treated

7   you as family, placed you in a position as a corporate

8   officer, you betrayed the license on your wall.  When you

9   stack up layer upon layer all of those things, I find it

1:36PM  10   very difficult to find any justification whatsoever.  I

11   can't think of a single thing that you could say to

12   rationalize that conduct.

13            And that's the sentiment that I was trying to

14   convey, Mr. Fant.  I've read the letter from your wife.

1:37PM  15   I've read the letter from your daughter.  That certainly

16   isn't how they view you.  They don't view you as a horrible

17   person.  They view you as somebody that was always there,

18   that when they had their own times of need, you were there.

19   And so in all fairness, I concede Mr. Alfaro's point, that a

1:37PM  20   Judge should not make an *ad hominem* attack.  That was not

21   the way that I meant that, although I agree with Mr. Alfaro

22   that it could be heard and viewed differently, but I hope

23   the added context helps.

24            Mr. Elser, does the government have any legal

1:38PM  25   reason why the Court should not impose the sentence as

1:38PM  1  stated?

2  MR. ELSER:  No, Your Honor.

3  THE COURT:  Sentence is imposed as stated.

4  MR. ELSER:  Your Honor, I don't know if this is the

1:38PM  5  right time to bring it up, but on the issue of the

6  forfeiture, the criminal forfeiture, we had proceeded on an

7  administrative forfeiture through the FBI as parallel to the

8  criminal forfeiture.  It's going to resolve quickly and it

9  may result in money being -- a decision about whether the

1:38PM  10  money should be remitted to the victims more quickly than if

11  we went through the judicial forfeiture.

12  So for that reason, we would like to move -- and I

13  can file a written motion if the Court would prefer -- but

14  we would like to dismiss the forfeiture allegation of the

1:39PM  15  information and forfeit the -- I'm talking about the items

16  that are listed in the original preliminary order of

17  forfeiture and the final order that we submitted to the

18  Court.  Those items would not be -- we would ask that the

19  forfeiture action as to those items be dismissed.

1:39PM  20  THE COURT:  Did we previously enter a preliminary

21  order?

22  MR. ELSER:  Yes, Your Honor.  I think it's

23  Document 36.

24  THE COURT:  The Court will show that the government

1:39PM  25  has moved to dismiss the criminal forfeiture allegations in

1:39PM   1   the information and the preliminary order notwithstanding.

2           The forfeiture allegations are dismissed with the

3   understanding that the government is electing to pursue

4   civil remedies in lieu of criminal remedies.

1:40PM   5           Mr. Fant, you do have the right to appeal, and that

6   includes the right to appeal the sentence that has now been

7   imposed. You're advised that if you would like to appeal,

8   there is a short time frame for doing so. You have only

9   14 days to get your notice of appeal on file with the clerk

1:40PM   10   of court. Secondly, if you can't afford to pay the filing

11   fee, the Court will waive it.

12           Third, I want you to understand that you have the

13   right to be represented by an attorney on appeal. And if

14   you can't afford to retain an attorney privately, the Court

1:40PM   15   will appoint an attorney free of charge to represent you on

16   appeal.

17           Mr. Fant, do you understand these rights on appeal?

18           THE DEFENDANT: Yes, Your Honor.

19           THE COURT: All right, sir. Anything else from the

1:41PM   20   government?

21           MR. ELSER: No, Your Honor.

22           THE COURT: Anything else, Mr. Alfaro?

23           MR. ALFARO: Yes, Your Honor. I think the issue of

24   whether Mr. Fant can self-surrender.

1:41PM   25           THE COURT: What's the government's position on

1 detention or self-report?

2          MR. ELSER:  We don't have any objection to

3 self-report, Your Honor.

4          THE COURT:  Okay.  Let's look between four and six

5 weeks out.  It will take a little bit longer since the

6 medical designators will need to get involved.

7          MS. CRAIG:  June 19th is a Wednesday.  That's six

8 weeks.

9          THE COURT:  Okay.  The Court will allow Mr. Fant,

10 who has been fully compliant on pretrial and presentence

11 conditions, to self-report.  Mr. Fant, you must do so by no

12 later than 1:00 p.m. on Wednesday, June 19th.

13          Mr. Fant, it's a privilege to be allowed to

14 self-report.  I do need to make sure you understand that

15 this isn't like you come down to the courthouse and turn

16 yourself in on June 19th.  The Bureau of Prisons will inform

17 you and Mr. Alfaro of the facility where you have been

18 designated and you have to pay the money to get yourself

19 there.  And that's true whether it's Springfield, Missouri,

20 where they have a medical center, or Butner, North Carolina,

21 where they have a medical center, or Fort Worth, Texas,

22 where they have a medical center, or perhaps California or

23 Maine.  Anywhere in the country, it's your obligation to get

24 yourself there at your own expense and by the deadline.

25          Do you have the financial wherewithal to do that?

117

1:43PM 1        THE DEFENDANT:  Yes, my daughter does.

2        THE COURT:  If you don't show up, potentially bad

3    things could happen in terms of how you are classified by

4    the BOP.  So I tell you this simply so that you will

1:43PM 5    understand, this is a big deal.  If you don't show up on

6    time, it's taken very seriously.

7        Do you understand that?  I'm asking if you

8    understand that.

9        THE DEFENDANT:  Yes, Your Honor.  I was choking for

1:43PM 10   a second.

11       THE COURT:  Thirdly, you will remain on the same

12   bond conditions that you were on pretrial and presentence.

13       I need to make sure that he was restricted to the

14   Fayetteville division counties.  Is he?

1:44PM 15       OFFICER CALDERON:  Your Honor, let me refer back to

16   the PSR.  I believe he's restricted.

17       THE COURT:  It doesn't matter.  To the extent that

18   you were given a longer leash previously, your travel is now

19   restricted to the counties in the Fayetteville division;

1:44PM 20   Washington, Benton and Madison County, plus what's the name

21   of the county in Oklahoma?

22       MR. ALFARO:  I can't remember, Your Honor, but he

23   resides in Oklahoma.  Sequoyah County.

24       THE COURT:  And that's a county that is contiguous

1:44PM 25   to Arkansas?

1:44PM    1          MR. ALFARO:  Yes, Your Honor.  He also receives --

     2    his primary care physician, his doctors are in Fort Smith

     3    and Fayetteville.  So I would say Sebastian County as well,

     4    Your Honor.  We would request permission for that.

1:44PM    5          THE COURT:  You can obviously go home, which is in

     6    Sequoyah County, Oklahoma.  And you can obviously go to your

     7    doctors in Sebastian County.  Otherwise, your travel is

     8    restricted to Sequoyah County, Washington County, Benton

     9    County, and Madison County, Arkansas.

1:45PM   10          Do you understand that?

    11          THE DEFENDANT:  Yes, Your Honor.

    12          THE COURT:  All right.  There being no further

    13    business before the Court, we are adjourned.

    14               (proceedings concluded at 1:45 p.m.)

    15

    16

    17

    18

    19

    20

    21

    22

    23

    24

    25

```
 1                    C E R T I F I C A T E

 2

 3          I, Paula K. Barden, RPR, RMR, FCRR, Federal

 4    Official Court Reporter, in and for the United States

 5    District Court for the Western District of Arkansas, do

 6    hereby certify that pursuant to Section 753, Title 28,

 7    United States Code that the foregoing is a true and

 8    correct transcript of the stenographically reported

 9    proceedings held in the above-entitled matter and that the

10    transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United

12    States.

13          Dated this 11th day of June 2024.

14

15

16

17    
      -------------------------------------
18          PAULA K. BARDEN, RPR, RMR, FCRR #700
            Federal Official Court Reporter
19          Western District of Arkansas

20    

21

22

23

24

25
```